1  MARLENE S. MURACO, Bar No. 154240
   KIMBERLY GEE RAMOS, Bar No. 264894
2  LITTLER MENDELSON, P.C.
   50 W. San Fernando, 15th Floor
3  San Jose, CA  95113.2303
   Telephone:     408.998.4150
4  Fax No.:        408.288.5686
5
6  Attorneys for Defendants
   THE SERVICEMASTER COMPANY LLC,
7  MERRY MAIDS LIMITED PARTNERSHIP, and
   MM MAIDS LLC
8
                    UNITED STATES DISTRICT COURT
9                   EASTERN DISTRICT OF CALIFORNIA

10 ANGELA CRUZ, MARIA MADRIGAL          CASE NO.  1:15-CV-01563-TLN-EPG
   LOURDES BAIZ AND CHRISTIE
11 GOODMAN, individuals, residing in    **DEFENDANTS' SERVICEMASTER**
   California,                          **COMPANY LLC, MERRY MAIDS**
12                                      **LIMITED PARTNERSHIP AND MM**
                Plaintiff,              **MAIDS LLC'S NOTICE OF MOTION AND**
13                                      **MOTION FOR SUMMARY JUDGMENT,**
        v.                              **OR IN THE ALTERNATIVE, PARTIAL**
14                                      **SUMMARY JUDGMENT**
15 MM 879, INC., a corporation; BARRETT
   BUSINESS SERVICES, INC., a           Date:      October 6, 2016
16 corporation; SERVICEMASTER           Time:      2:00 p.m.
   COMPANY LLC., a corporation; MERRY   Judge:     Hon. Troy L. Nunley
17 MAIDS LIMITED PARTNERSHIP, a         Location:  Courtroom 2
   limited partnership; MERRY MAIDS
18 LIMITED LIABILITY CORPORATION,       Complaint Filed:  April 6, 2011
   a limited liability corporation, and DOES 1  Removal Filed:    October 14, 2015
19 through 98, inclusive,               Trial Date:       None
20
                Defendants.
21
22
23
24
25
26
27
28

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

# TABLE OF CONTENTS

PAGE

NOTICE OF MOTION .................................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES .................................................. 1

I.      INTRODUCTION ................................................................................................ 1

II.     STATEMENT OF FACTS .................................................................................. 2

     A.      Relationship Among the Defendants ....................................................... 2

     B.      Plaintiffs' Claims ..................................................................................... 4

     C.      MM879's Franchise Agreement .............................................................. 5

     D.      The Operations Manual ............................................................................ 6

     E.      MM879's Wage and Hour Practices ....................................................... 7

III.    RELEVANT PROCEDURAL BACKGROUND ............................................... 10

IV.     ARGUMENT ..................................................................................................... 12

     A.      Legal Standard For Summary Judgment/Adjudication............................ 12

     B.      MM879 Was Not the Moving Defendants' Agent For Purposes Of The California Labor Code ............................................................................... 13

     C.      Defendants Were Not A Joint Employer Of Plaintiffs ............................ 19

          1.      The Moving Defendants Did Not Suffer Or Permit Plaintiffs To Work ....... 19

          2.      The Moving Defendants Did Not Exercise Control Over Plaintiffs' Wages, Hours Or Working Conditions.......................................... 21

          3.      The Moving Defendants Did Not Engage The Plaintiffs To Work .............. 23

     D.      MM879 Is Not The Alter Ego Of The Moving Defendants ..................... 23

V.      CONCLUSION .................................................................................................. 25

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

i.

(CASE NO.  1:15-CV-01563—TLN-EPG )

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)..............................................................................12, 13

Laird v. Capital Cities/ABC,
   68 Cal.App.4th 727 (1998) ..........................................................................24

Las Palmas Assocs. V. Las Palmas Ctr. Assocs.,
   235 Cal.App.3d 1220 (1991) ........................................................................24

Lukov v. Schindler Elevator Corp.,
   2012 WL 5464622 (N.D. Cal. Nov. 8, 2012) ..............................................12

Martinez v. Combs,
   49 Cal.4th 35 (2010) ........................................................................... passim

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
   475 U.S. 574 (1986)......................................................................................12

Mesler v. Bragg Mgmt. Co.,
   39 Cal.3d 290 (1985) ....................................................................................24

Ochoa v. McDonald's Corp.,
   133 F.Supp.3d 1228 (2015) ....................................................................22, 23

Patterson v. Domino's Pizza, LLC,
   60 Cal.4th 474 (2014) ......................................................................... passim

Roman Catholic Archbishop of San Francisco v. Superior Ct.,
   15 Cal.App.3d 405 (1971) ............................................................................24

Sonora Diamond Corp. v. Superior Ct.,
   83 Cal.App.4th 523 (2000) ..........................................................................24

Vann v. Massage Envy Franchising LLC
   (S.D. Cal. January 6, 2015) 2015 U.S. Dist. LEXIS 1002.................16, 17, 18

STATUTES

CAFA ....................................................................................................................12

Labor Code sec. 226 ..............................................................................................4

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56 ........................................................................................................... 1

Fed. R. Civ. P. 56(a) ...................................................................................................... 12

Fed. R. Civ. P. 56(c) ...................................................................................................... 12

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,        iii.        (CASE NO.  1:15-CV-01563—TLN-EPG )
PARTIAL SUMMARY JUDGMENT

**NOTICE OF MOTION**

**TO PLAINTIFFS AND TO THEIR ATTORNEY OF RECORD:**

**PLEASE TAKE NOTICE** that on October 6, 2016, at 2:00 p.m. in Courtroom 2 of the United States District Court, Eastern District of California, located at 2500 Tulare Street, Fresno, California, Defendants THE SERVICEMASTER COMPANY LLC, MERRY MAIDS LIMITED PARTNERSHIP, and MM MAIDS LLC ("Moving Defendants") will and hereby do move this Court for an Order granting Summary Judgment, Or In The Alternative, Motion For Partial Summary Judgment of Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz and Christie Goodman's ("Plaintiffs") claims against Moving Defendants.

Moving Defendants' motion is made pursuant to Fed. R. Civ. P. 56 and is based on this Notice, the Memorandum of Points and Authorities set forth below, the Declarations of Marlene S. Muraco, Micah Newhouse, and Michael Luders and exhibits thereto, the files and records in this action, and any further evidence and argument that the Court may receive at or before the hearing.

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

As recognized by the California Supreme Court, "[f]ranchising…has become a ubiquitous, lucrative, and thriving business model"; one that "benefits both parties." *Patterson v. Domino's Pizza, LLC,* 60 Cal.4th 474, 477 (2014). The very nature of the business format requires the franchisor to "impose[] comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way." *Id.* at 478. This, the Court acknowledged, gives the franchisor control over the enterprise. *Id.* However, "[i]t is the franchisee who implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior." *Id.* The California Supreme Court instructed that "[a]nalysis of the franchise relationship for vicarious liability purposes must accommodate these contemporary realities." *Id.*

In apparent disregard of this directive, Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz and Christie Goodman (collectively, "Plaintiffs") seek to maintain various wage and hour claims against Defendant Merry Maids Limited Partnership ("Merry Maids" or the "Franchisor") and MM Maids LLC and ServiceMaster Company LLC ("ServiceMaster"), the

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT                1.                (CASE NO.  1:15-CV-01563—TLN-EPG )

corporate parents of the Franchisor (collectively referred to as the "Moving Defendants"). Plaintiffs were hired and employed by Defendant MM879, Inc. ("MM879"), a Merry Maids franchisee. An independent business, MM879 is responsible for all aspects of its operation – including all decisions on how to hire, train, supervise, discipline, fire, and compensate all of its employees. As set forth below, the undisputed material facts demonstrate that MM879's owner – and his family, who work for MM879 – were solely responsible for the day-to-day operation of the business, including all decisions and practices relating to employee compensation. Plaintiffs, too, admit that they had no contact with anyone from the Franchisor, MM Maids LLC, or ServiceMaster. They admit further that the owners and manager of MM879 were the only people who ever provided them with supervision, instruction, coaching, training, direction or management of their daily job activities.

Plaintiffs' claims against the Moving Defendants fail because, as confirmed by the Supreme Court in *Patterson*, a franchisor cannot be held liable for the employment-related practices of its franchisee unless the franchisor retained a general and direct right to control the hiring, supervision, discipline, termination and other day-to-day aspects of managing the franchisee's employees. The undisputed material facts fail to demonstrate that level of control, and the Moving Defendants are entitled to summary judgment dismissing all claims against them as a matter of law.

## II.   STATEMENT OF FACTS

### A.   Relationship Among the Defendants

ServiceMaster Company, LLC ("ServiceMaster") is based in Memphis, Tennessee. Through a series of subsidiaries, ServiceMaster owns multiple franchised brands including ServiceMaster Clean®, AmeriSpec®, Terminix®, Furniture Medic® and Merry Maids®. The Franchisor for the Merry Maids® system is Defendant Merry Maids, LP ("Merry Maids"), a subsidiary of ServiceMaster. Defendant MM Maids LLC is the general partner in Merry Maids. (Declaration of Micah Newhouse ("Newhouse Decl."), ¶ 4.) Merry Maids presently has approximately forty California franchisees, each of which operates one or more franchises. (Declaration of Mike Luder ("Luder Decl."), ¶ 2.)

Defendant MM879 is an independently owned and operated Merry Maids® franchisee based in Fresno and Lodi, California pursuant to a written Franchise Agreement with

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT                2.                (CASE NO.  1:15-CV-01563—TLN-EPG )

1    Merry Maids LP ("Franchise Agreement").   As a Merry Maids® franchisee, MM879 is in the

2    business of providing house cleaning services for private residences.  (Plaintiffs' Fifth Amended

3    Complaint ("FAC"), ¶ 30.)   MM879 is a separate legal entity (corporation) unrelated to the Moving

4    Defendants.  (Newhouse Decl., ¶ 5).   The Moving Defendants have no ownership or partnership

5    stake in MM879 and the entities do not share profits or losses.  (*Id.*)  MM879 does not have any

6    owners, officers, directors or employees in common with the Moving Defendants.   (*Id.*)   The

7    Moving Defendants do not have access to MM879's bank accounts.  (*Id.*)  MM879 was responsible

8    for filing its own tax returns and obtaining all necessary licenses and operating permits.  (*Id.*)

9            MM879 is solely responsible for the hiring, day-to-day supervision and termination of

10   its employees.  (Newhouse Decl, ¶ 6; Deposition of Jeff Skadburg, Owner and COO of MM879,

11   dated August 16, 2012 ("Skadburg Depo. I"), p. 261:3-6, 267:18-269:7, 165:5-12, 263:12-265:2;

12   262:13-263:7, 269:14-16; Plaintiffs' Supplemental Response to Defendants Interrogatories, Set One,

13   attached as Exhibit F to the Declaration of Marlene Muraco ("Muraco Decl.") ("Plaintiffs' Rog

14   Response"), Response to Interrogatory Nos. 3-5, p. 12-13.)   The Moving Defendants have never

15   directed MM879 to hire, discipline or terminate any particular individual.  (Newhouse Decl., ¶ 6;

16   Skadburg Depo. I, p. 261:3-6, 263:12-265:2, 267:17-269:7, 265:5-12.)   MM879 was at all times

17   responsible for the direct supervision of its own employees.  (*Id.*)  For example, no one from the

18   Moving Defendants has ever scheduled MM879's employees for work, supervised them in the

19   course of performing their work tasks, administered their benefits, decided which individuals would

20   be hired, disciplined or terminated by MM879, interviewed candidates for positions with MM879 or

21   trained MM879's employees.  (Newhouse Decl., ¶ 6; Skadburg Depo. I, p. 261:3-6, 263:12-265:2,

22   267:17-269:7, 265:5-12; Plaintiffs' Rog Responses Nos. 3-5, p. 12-13.)

23            Defendant Barrett Business Services, Inc. ("BBSI") is a professional employment

24   organization (PEO) that MM879 hired to provide payroll management, benefits administration,

25   human resource and other services during the relevant time period. .  (Deposition of Gerald Blotz,

26   Vice-President and COO of BBSI ("Blotz Depo."), p. 27:16-28:4 and Exhibit 2 thereto, p. 1-2;

27   Blotz Depo., p. 57:22-23, 59:7-14, 60:12-61:13, and Exhibit 4 thereto, p. 4; Skadburg Depo. I, p.

28   47:2-6,  48:4-17,  124:18-25.)     BBSI  entered  into  its  relationship  with  MM879  without  any

1   involvement from the Moving Defendants.  BBSI is not a preferred vendor of Merry Maids and has

2   never had any direct communications with Merry Maids.  (Blotz Depo., p. 29:12-31:17.)

3   **B.    Plaintiffs' Claims**

4         Plaintiffs Angela Cruz, Maria Madrigal and Lourdes Baiz were each employed by

5   MM879 as hourly, non-exempt housekeepers during some portion of the period May 2006 through

6   August 2010.  (Plaintiffs' FAC, ¶ 29.)  Plaintiff Christie Goodman was employed by MM879 in the

7   same capacity during the period April 2011 through March 2013.  (*Id.*)

8         Plaintiffs assert that they were paid pursuant to a "piece-rate compensation scheme"

9   based on "a fixed percentage of the fee paid by each customer" and were thereby denied

10  compensation at "the California minimum wage for all hours worked, including but not limited to

11  time spent…engaged in activities other than house cleaning, such as travelling to and from

12  customers' houses and meeting at [MM879's] offices each morning to receive their assignments and

13  perform other clerical tasks."  (FAC, ¶ 31(d).)  Plaintiffs also allege that they were not provided with

14  compliant meal and rest breaks, were not reimbursed for driving expenses, and were provided with

15  deficient wage statements in violation of Labor Code sec. 226.  (FAC, ¶¶ 32, 70-72, 87.)

16        Plaintiffs concede that they have never had "any direct contact or communication

17  with any individual identifying themselves as being employed by ServiceMaster, Inc., Merry Maids

18  LP, or Merry Maids, LLC."  (Plaintiffs' Rog Response No. 3, p. 12, Exh. F.)  When asked to

19  "identify each and every individual who provided direct supervision, instruction, coaching, direction

20  or management of [their] daily job activities" at any time during their employment, Plaintiffs

21  identified only the owners of MM879 (Jeff and Jason Skadburg) and the manager of MM879's

22  Fresno location (Juanita Gonzalez).  (Plaintiffs' Rog Response No. 4, p. 13; Skadburg Depo. I, p.

23  20:2-10.)  When asked to identify "each and every individual who provided any training" to them

24  during their employment, Plaintiffs identified only the same three people.  (Plaintiffs' Rog Response

25  No. 5, p. 13.)

26        Although they had absolutely no contact or interaction with anyone from the Moving

27  Defendants during their employment, Plaintiffs nonetheless seek to hold them liable on the theory

28  that they qualify "as Plaintiffs' employer for purposes of the California Labor Code" or, in the

alternative, that they are "liable…under a theory of respondeat superior." (Plaintiffs' Rog Response No. 2, p. 5.)  As support for this theory, Plaintiffs rely exclusively upon the terms of the Franchise Agreement and the documents referenced therein.  (*Id.*, at p. 5-11.)

### C.   MM879's Franchise Agreement

Jeff and Jason Skadburg became co-owners of MM879 after their father, the prior owner, passed away in March 2008. (Skadburg Depo. I, p. 18:9-25.)  Jason Skadburg later left the company and as of August 2016, Jeff Skadburg is MM879's sole owner and President. (Deposition of Jeff Skadburg, dated August 10, 2016 ("Skadburg Depo. II"), p. 7:22-8:13.)  During the relevant period, the Skadburgs' have operated locations in Fresno and Lodi, at which they have employed 5-10 and 10-22 employees, respectively. (Skadburg Depo. I, p. 26:4-17, 26:18-21, 27:17-28:1, 53:13-54:4.)  The Skadburgs' Franchise Agreement sets forth the parameters of their contractual relationship, including the terms under which they may use the Merry Maids® trademarks and business system.[1] (Skadburg Depo. I, p. 213:25-214:12, and Exhibit 11 thereto.)

The Franchise Agreement expressly states that it "does not constitute Franchisee as an agent, legal representative, joint venture, partner, employee, or servant of Franchisor for any purpose whatsoever; and it is understood between the parties…that Franchisee shall be an independent contractor." (Skadburg Depo. I, Exh. 11, p. 24, ¶ 16(A).)  Likewise, the "Agreement does not create a fiduciary relationship between [MM879 and Merry Maids]." (*Id.*)  Finally, the Franchise Agreement makes clear that "[u]nder no circumstances shall Franchisor be liable for any act, omission, debt, or any other obligation of Franchisee." (*Id.* at ¶ 16(B).)

Nothing in the Franchise Agreement addresses or limits MM879's right or ability to hire, supervise, direct, train or manage its own employees. (Skadburg Depo. I, Exh. 11, *passim*.)  Nothing in the Franchise Agreement addresses or limits MM879's right or ability to implement whatever lawful wage and hour practices it chooses. (*Id.*)  To the contrary, the Franchise Agreement

---

[1]   MM879 has no contractual agreement with ServiceMaster.  Jeff Skadburg testified that he recognizes ServiceMaster as being a separate business from Merry Maids and does not consider ServiceMaster to be his franchisor. (Skadburg Depo., p. 260:16-261:2.)

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

5.

(CASE NO.  1:15-CV-01563—TLN-EPG )

1   specifically states that MM879 shall "[c]omply at all times with all federal, state and municipal laws,

2   regulations, ordinances, orders, and rulings". (Skadburg Depo. I, Exh. 11, p. 12, ¶ 10.D.)

3        In arguing that Merry Maids is liable for MM879's alleged wage and hour violations,

4   Plaintiffs rely heavily upon paragraph 7(A) of the Franchise Agreement, which states in relevant part

5   that "[i]n order to protect the reputation and goodwill associated with the Marks and to maintain the

6   uniform standards of operation thereunder, Franchisee shall conduct its Franchised Business in strict

7   accordance with Franchisor's MM Manual."[2] (Skadburg Depo. I, Exh. 11, p. 10, ¶ 7.A.)   The MM

8   Manual is defined as "all those Manuals, documents, booklets, guides and related materials

9   containing the specifications, standards, procedures and rules applicable to the Franchise prescribed

10   from time to time by Franchisor," and includes "Franchisor's so-called Operations Manual,

11   Marketing Manual, Customer Information Systems Manual, Identity Manual, CBT programs,

12   software programs, and such other programs, materials and training aids designated as confidential

13   and from time to time revised by Franchisor." (*Id.*)

14   **D.**    **The Operations Manual**

15        The Operations Manual referenced in the Franchise Agreement contains mandatory

16   and suggested specifications, standards, operating procedures and rules that Merry Maids

17   periodically prescribes for operating a franchise.   (Newhouse Decl., ¶ 7; Deposition of Micah

18   Newhouse ("Newhouse Depo."), p. 76:10-77:11.)   The current version of the Operations Manual is

19   dated November 2007.   (Newhouse Decl., ¶ 7.)   Since that time, Merry Maids has provided

20   franchisees with guidance, best practices and other information about many of the topics addressed

21   in the Manual through MM Link and MM Connect, two websites maintained by Merry Maids for

22   use by its franchisees and corporate-owned branches. (*Id.*) The Operations Manual has never been a

23   State-specific document. (*Id.*) There is and was a single version of the Operations Manual made

24   available to all franchisees throughout the country. (*Id.*) That fact is one of the reasons that the

25   Franchise Agreement requires that the franchisee comply with all applicable State laws. (*Id.*)

26

27   [2]    The term "Marks" is defined as "the trademark Merry Maids®, other trademarks, trade

28   names, service marks, commercial announcements (slogans) and related insignia (logos) Franchisor owns". (Skadburg Depo., Exh. 11, p. 1.)

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150
DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT
6.
(CASE NO.  1:15-CV-01563—TLN-EPG )

1        The 2007 version of the Operations Manual includes a section on the interviewing

2   process, which sets forth some best practices for interviewing job candidates. (Newhouse Decl., ¶

3   8.)   The section suggests that the interviewer explain the pay system and methodology for

4   reimbursing mileage expenses and includes a description of a pay system and mileage methodology.

5   (*Id.*) Merry Maids does not require that franchisees interview candidates in the manner described in

6   the Manual and does not require that franchisees compensate their employees in any particular way.

7   (*Id.*; Skadburg Depo. I, p. 33:20-34:12;   Declaration of Mike Luders, Merry Maids Western

8   Regional Director, attached as Exhibit J to the Muraco Decl. ("Luders Decl."), ¶¶ 4-5.)  Who and

9   how to interview, how to compensate employees and how to reimburse them for expenses are among

10  the many matters that are left to the discretion of the franchisee, with the sole caveat that they must

11  conduct their business in accordance with applicable laws.  (Newhouse Decl., ¶ 8; Luders Decl., ¶¶

12  4-5.)  As a result, although the California franchisees use a variety of methods for compensating

13  their employees and reimbursing mileage expenses, Merry Maids has never advised a California

14  franchisee that its pay plan did not comply with Merry Maids' requirements.  (Luders Decl., ¶¶ 4-5.)

15       Jeff Skadburg began overseeing the operation of MM879s Fresno operation in 2005

16  before he became co-owner and CFO of the entire company in 2008.  (Skadburg Depo. I, p. 12:8-20,

17  16:22-17:6, 18:9-19:10, 19:16-22.)  He testified that he has never read the Operations Manual, was

18  never told he had to read that Manual, has never heard of a Merry Maids Marketing Manual or

19  Identity Manual, and has heard that a Customer Information Systems Manual exists, but has no idea

20  where to find it.  (Skadburg Depo. I, p. 35:6-13, 193:13-18, 236:10-24, 248:22-249:7, 266:3-6.)

21      **E.**    **MM879's Wage and Hour Practices**

22       Jeff Skadburg made it clear that Merry Maids did not control, oversee or require

23  MM879 to adopt the wage and hour practices at issue in this matter.  Specifically, he testified:

24  - he makes his own decisions about how to run the day-to-day operation of their
       Merry Maids business (Skadburg Depo. I, p. 261:3-6, 267:17-269:7);

25

26  - no one from Merry Maids or ServiceMaster has ever threatened to terminate his
       franchise agreement unless he takes some specific action with respect to
       employees (Skadburg Depo. I, p. 265:5-12);

27

28  - he grew up in the business and has chosen to retain some of the wage and hour
       practices that were put in place by his father and to change other practices

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

7.

(CASE NO.  1:15-CV-01563—TLN-EPG )

(Skadburg Depo. I, p. 34:15-35:17, 266:3-20, 75:12-76:18 (obtained his method of ensuring minimum wage compliance from his father), 190:24-200:23 202:5-204:23, 205:11-18 (describing how and why he devised and changed his method of calculating mileage reimbursement), 66:25-71:9, 134:22-135:11 (describing how and why he changed the formula for calculating what employees are paid for cleaning a house), 149:13-150:8 (describing how and why he changed the process for recording employee time), 179:9-180:9 (describing the NPS and score card bonuses he instituted); 180:5-181:15 (describing why he cancelled the quality assurance bonus program); 58:2-59:22 (describing how and why he decided to adjust his staffing practices so that team members can earn more money);

- neither Merry Maids nor ServiceMaster has ever given him any input, direction, suggestions, or advice about how much to pay his employees (Skadburg Depo. I, p. 262:9-12, 12:8-14:6 (the topic of how to compensate employees was not addressed in the eight-day Merry Maids training session he attended after assuming responsibility for the Fresno office);

- he did ask for and receive input from BBSI about how much to pay his employees, and no one from Merry Maids prevented him from taking BBSI's advice (Skadburg Depo. II, p. 67:5-18, 70:7-24);

- no one from Merry Maids has told him how or what to pay his employees and he understands that he can pay them in any manner he feels is best for his business (Skadburg Depo. I, p. 33:20-34:12, 262:13-263:7, 269:14-16);

- he voluntarily chose to implement a percentage pay system for his house cleaners (Skadburg Depo. I, p. 35:6-13, 133:3-134:2, 269:25-270:2);

- he made the decision to implement a bonus program for team members (Skadburg Depo. II, p. 17:2-20, 60:11-23), and no one from Merry Maids has ever told him that he has to use any kind of bonus or promotion programs (Skadburg Depo. I, p. 270:3-6);

- no one from Merry Maids has ever told him what percentage or rate to use for mileage reimbursement (Skadburg Depo. I, p. 270:7-9, 193:13-18 (never read the portion of the Operations Manual that addresses mileage reimbursement)), and despite being advised in 2011 that Merry Maids was going to begin reimbursing mileage for its branch employees at the IRS rate, he opted not to implement such a system for another year (Skadburg Depo. II, p. 84:19-86:4);

- BBSI is solely responsible for processing MM879's payroll and for issuing the wage statements his employees receive (Skadburg Depo. I, p. 53:1-4, 126:11-17, 174:21-175:17, 177:2-178:21, and Exh. 6 thereto);

- he and his brother are responsible for administering MM879's meal and rest break policies (Skadburg Depo. I, p. 115:20-23, 129:9-130:5, 131:10-133:2, 134:19-21, 167:23-170:7, and Exh. 2, p. 33 thereto);

- neither Merry Maids nor ServiceMaster has ever been involved in the direct supervision of his employees at any time (Skadburg Depo. I, p. 263:12-264:21);

- from his perspective, neither Merry Maids nor ServiceMaster has substantial control over the day-to-day operation of his franchise business (Skadburg Depo. I, p. 264:24-265:2); and

- he understands that under the terms of the Franchise Agreement he is obligated to comply with local and state and federal laws, including employment laws (Skadburg Depo. I, p. 270:19-24).

In fact, the pay practices Plaintiffs are challenging are set forth in MM879's employee handbook, which was drafted by BBSI. (Skadburg Depo. I, p. 108:17-109:2, and Exh. 2 thereto, p. 31 ("Payment of Wages"), p. 33 ("Meal and Rest Periods," "Pay for Mandatory Meetings/Training," and "Overtime for Non-Exempt Employees"), p. 34 ("Team Member Compensation"),[3] p. 36 ("Employees Who Are Required to Drive").)  BBSI provided the original draft of the handbook, which Mr. Skadburg reviewed and revised in 2008, and again at least one more time after August 2012. (*Id.* at p. 109:12-110:14, 134:19-21; Skadburg Depo. II, p. 35:25-36:19.)  During the most recent revisions, BBSI made changes to the handbook as requested by Mr. Skadburg, and Merry Maids had no input in this process. (*Id.* at 38:19-40:5, 65:16-25.)  MM879 has never shown its employee handbook to Merry Maids and, to Mr. Skadburg's knowledge, neither has anyone else. (Skadburg Depo. I, p. 200:24-201:15.)

Not only was Merry Maids not responsible for MM879's wage and hour policies, it actually advised MM879 (and other Merry Maids® California franchisees) in November 2009 that if they were paying their employees in the manner at issue in this lawsuit (compensating employees for time spent cleaning houses by paying them a percentage of the fees collected), they should consider changing to a system whereby employees were paid an hourly rate plus a bonus. (Newhouse Depo., p. 169:5-172:17, and Exh. 8 thereto; Luders Decl., ¶ 6, and Exh. 1 thereto.)  The email notification was initially sent by Mike Luders, Merry Maids Western Regional Director, to the franchisees in his Region, including MM879 and all the other California Merry Maids® franchisees, on November 23, 2009. (*Id.*)  Mr. Luders then re-circulated the email a year later.  In both cases, MM879 was advised as follows:

> I wanted to inform you of some compensation changes we are making in the branches[4] for our California locations.  These are due to the very specific wage and

---

[3]   The Team Member Compensation Policy set forth in the employee handbook is similar to the pay system described in Merry Maids' Operations Manual. (Compare Skadburg Depo., Exh. 2, p. 34 and Newhouse Depo., Exh. 5, p. 43-44 (authenticated at Newhouse Depo., p. 107:10-108:11).)

[4]   "Branches" are Merry Maids, LP's corporate-owned and operated locations, as distinguished from independently owned and operated franchise locations. (Luders Decl., ¶ 2.)

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

9.

(CASE NO.  1:15-CV-01563—TLN-EPG )

hourly rules set up in California and our potential exposure as they relate to interpretation and our employee's understanding of how they are paid. We thought to simplify the process would be a good idea for everyone.

It really comes down to one change and it is basically how we explain our team member compensation. See attached. **Some of you in California have already made this change**.

All associates who do cleaning will be paid a base agreed upon hourly rate. This will be their pay for services. Production bonuses can also be earned upon the completion of each home that is cleaned, less the total hourly rate earned for the day....

As you can see, instead of their pay being the percentage amount with a guaranteed base, it is now the base with a production bonus paid if the productivity of work they perform exceeds the hourly rate....

We are in the process of making this change in the branches and wanted you aware of it as soon as possible. **Of course your compensation rates and plans can be unique to your operation providing you are in compliance with state and federal law** but I thought it would be a good idea to let you know what we are doing at the branch level in California.

(*Id.* (emphasis added).)   The Compensation Plan then in effect at Merry Maids' corporate-owned California branch locations was attached to the email as a reference. (*Id.*)  Although Mr. Skadburg took this email as a suggestion that he adopt some form of hourly pay plan, and admittedly could have implemented such a plan at any time, Mr. Skadburg chose not to make a corresponding change to MM879's pay plan for several years. (Skadburg Depo I, p. 35:18-36:1; Skadburg Depo. II, p. 82:16-84:13 (Mr. Skadburg agreed that as a franchisee owner, he was free to set compensation rates and plans, unique to his operation, provided he is in compliance with the law)).

## III.   RELEVANT PROCEDURAL BACKGROUND

On April 6, 2011, Plaintiffs filed their complaint alleging various wage and hour claims against Defendants in the Fresno County Superior Court ("Superior Court"). On August 28, 2014, the California Supreme Court issued its' decision in *Patterson v. Domino's Pizza LLC*, 60 Cal.4th 474 (2014) ("*Patterson*"), holding that the potential liability of a franchisor for a franchisee's misdeeds "requires that the franchisor exhibit the traditionally understood characteristics of an 'employer' or 'principal'; i.e., it has retained or assumed a general right of control over factors such as hiring direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees." *Id.* at 477-478, 497.

In January 2015, Moving Defendants filed a motion for summary judgment, in which

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

10.

(CASE NO.  1:15-CV-01563—TLN-EPG )

they applied *Patterson* to demonstrate that Moving Defendants did not retain or assume a general right of control over the day-to-day operation of MM879's business. In opposition, Plaintiffs' entire argument hinged on paragraph 7 of the Franchise Agreement, which states that MM879 will "conduct its Franchised Business in strict accordance with franchisor's MM Manual" and reserved Merry Maids' right to terminate the business relationship. Plaintiffs relied on this language to claim that Merry Maids retained the right to control MM879's business, regardless of the many ways in which MM879 asserted actual control over MM879's employees, and that under *Patterson* this was sufficient to establish joint employment.

On July 13, 2015, the Superior Court issued a six-page, well-reasoned tentative ruling granting summary judgment in favor of Moving Defendants. (Tentative Ruling, attached as Exhibit G to the Muraco Decl.) As to the processes and procedures described in the MM Manual, the Superior Court concluded they went "to quality control and ensuring that MM879 provides uniform services to other Merry Maids franchisees, which [is] permissible in the franchise context." (*Id.* at p. 4.) While some portions of the Operations Manual do address "personnel management issues," the Superior Court concluded they do so "only in a general [and] informational" sense. (*Id.*) The overriding and key fact, however, was that there is absolutely "no evidence that Merry Maids had any direct involvement with any MM879 employee." (*Id.*)

Moreover, the Superior Court concluded there was "no evidence that Merry Maids set the compensation scheme utilized by MM879," or "negotiated or set plaintiffs' rate of pay," "no basis to conclude that Merry Maids controlled the issuance of wage statements," "no evidence that Merry Maids had any role in the creation or administration of MM879's meal or rest break policies, or that they had any role in administering those policies," and "no evidence that [Merry Maids] controlled the [mileage reimbursement policy] MM879 used." (*Id.* at pp. 3-5.)

On August 10, 2015, the Superior Court issued a 2-page Order abandoning its tentative ruling without modifying or discounting any of the foregoing conclusions. (Order After Hearing on Summary Judgment and/or Summary Adjudication, attached as Exhibit H to the Muraco Decl.) In a 180-degree change in reasoning, the Superior Court disregarded the undisputed evidence that Merry Maids played no role in the daily management of MM879's employees, holding instead

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

11.

(CASE NO. 1:15-CV-01563—TLN-EPG )

1    that Merry Maids could be liable if it retained the ability to control the relevant day-to-day
2    operations of MM879, even if it *never exercised* such control and concluding there was a triable
3    issue regarding whether Merry Maids "retained sufficient control to make it plaintiffs' employers."
4    (*Id.* at p. 2.)

5        With Plaintiffs' five-year deadline to bring this action to trial approaching, Plaintiffs
6    moved for class certification on September 21, 2015. On October 2, 2015, Moving Defendants
7    received a settlement demand from Plaintiffs that was in excess of $5 million. As that demand
8    created jurisdiction under CAFA, Moving Defendants removed this action to this Court on October
9    14, 2015, before the class certification motion was resolved.

10   **IV.    ARGUMENT**

11       **A.    Legal Standard For Summary Judgment/Adjudication**

12       Summary judgment is proper "if the movant shows that there is no genuine dispute as
13   to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).
14   The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue
15   of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy
16   its burden by presenting evidence that negates an essential element of the non-moving party's case
17   or by demonstrating that the non-moving party cannot produce evidence to support an essential
18   element upon which it will bear the burden of proof at trial. *Id.* at 322-23.

19       The burden then shifts to the non-moving party to "designate 'specific facts showing
20   that there is a genuine issue for trial.'" *Id.* at 324 (quoting then-Fed. R. Civ. P. 56(e)). The non-
21   moving party must "do more than simply show that there is some metaphysical doubt as to the
22   material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
23   Rather, the opposing party must tender evidence of specific facts in the form of affidavits, and/or
24   admissible discovery material, in support of its contention that a factual dispute exits. *Id.* at 586,
25   n.11; Fed. R. Civ. P. 56(c). However, "the mere suggestion that facts are in controversy, as well as
26   conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat
27   summary judgment." *Lukov v. Schindler Elevator Corp.*, 2012 WL 5464622, at *3 (N.D. Cal. Nov.
28   8, 2012), citing *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

12.

(CASE NO. 1:15-CV-01563—TLN-EPG )

While the opposing party need not establish a material issue conclusively in its favor, "failure of proof concerning an essential element of the . . . case necessarily renders all other facts immaterial. *Celotex*, 477 U.S. at 322. Summary judgment must be granted for the moving party if the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.*

Here, in order to prevail on their claims for unpaid overtime, minimum wages, meal and rest period premiums, as well as their related penalty claims, Plaintiffs must prove that the Moving Defendants were their "employer". *Martinez v. Combs*, 49 Cal.4th 35, 49 (2010). Plaintiffs have espoused three theories to satisfy this burden: 1) the Moving Defendants were agents of each other and were "at all times acting within the course and scope of [that] agency" (FAC, ¶ 11); 2) the Moving Defendants were joint employers of Plaintiffs in that they "exercised sufficient control over Plaintiffs' wages, hours and working conditions, and/or suffered or permitted Plaintiffs to work" (FAC, ¶ 12); and 3) the Moving Defendants are liable for the acts of the other because they are all "alter egos" (FAC, ¶ 14). The undisputed facts show that none of Plaintiffs' theories have merit.

### B. MM879 Was Not the Moving Defendants' Agent For Purposes Of The California Labor Code.

In *Patterson*, the California Supreme Court considered the circumstances under which a franchisor can be held liable for the employment-related misdeeds of a franchisee. The Court began its opinion by considering the unique nature of a franchising relationship:

> Franchising…has become a ubiquitous, lucrative, and thriving business model. This contractual arrangement benefits both parties. The franchisor, which sells the right to use its trademark and comprehensive business plan, can expand its enterprise while avoiding the risk and cost of running its own stores. The other party, the franchisee, independently owns, runs, and staffs the retail outlet that sells goods under the franchisor's name. By following the standards used by all stores in the same chain, the self-motivated franchisee profits from the expertise, goodwill, and reputation of the franchisor.

*Id.* at 477. The Court noted that past decisions had reached various results on whether a franchisor should be held liable for torts committed by a franchisee or its employees in the course of the franchisee's business using traditional "agency" terminology and focusing on the degree to which a particular franchisor exercised general "control" over the "means and manner" of the franchisee's

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALT., PARTIAL SUMMARY JUDGMENT

13.

(CASE NO. 1:15-CV-01563—TLN-EPG )

operations. *Id.* at 478. However, this test failed to accommodate the nature of franchising in today's world, in which "[a] franchisor, which can have thousands of stores located far apart, imposes comprehensive and meticulous standards for marketing its trademarked brand and operating its franchises in a uniform way," while "the franchisee retains autonomy as a manager and employer" and "implements the operational standards on a day-to-day basis, hires and fires store employees, and regulates workplace behavior." *Id.* Consequently, the Court elucidated the meaning of the definition of employment in the franchisor context:

> Analysis of the franchise relationship for vicarious liability purposes must accommodate these contemporary realities. The imposition and enforcement of a uniform marketing and operational plan cannot *automatically* saddle the franchisor with responsibility for employees of the franchisee who injure each other on the job. The contract-based operational division that otherwise exists between the franchisor and the franchisee would be violated by holding the franchisor accountable for misdeeds committed by employees who are under the direct supervision of the franchisee, and over whom the franchisor has no contractual or operational control. **It follows that potential liability on the theories pled here requires that the franchisor exhibit the traditionally understood characteristics of an "employer" or "principal"; i.e., it has retained or assumed a general right of control over factors such as hiring, direction, supervision, discipline, discharge, and relevant day-to-day aspects of the workplace behavior of the franchisee's employees.**

*Id.* at 478 (emphasis in original and added).

In *Patterson,* the Court granted summary judgment to Domino's on the plaintiff's claim that the franchisee was acting as Domino's "agent", thereby making Domino's liable for the sexual harassment she endured by a co-worker. In support of this agency theory, the plaintiff proffered evidence that Domino's established and enforced detailed requirements regarding pizza making and delivery, general store operations, and brand image. These standards were vigorously enforced through representatives of the franchisor who inspected franchised stores, and regularly rated the franchisee on many of these established operational requirements. *Patterson, supra,* 60 Cal.4th at 484. Domino's also sent letters to the franchisee about contractual problems unrelated to the underlying sexual harassment complaint, including the franchisee's use of unapproved products, delivery outside territorial limits, failure to provide financial records and nonpayment of royalties. *Id.* Domino's employed "Area Leaders" who trained franchisees, conducted store inspections and coached franchisees and their employees on resolving operational problems relating to pizza making,

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

14.

(CASE NO. 1:15-CV-01563—TLN-EPG )

1   food safety, product packaging, store cleanliness, employee hygiene, customer orders, consumer

2   complaints and delivery procedures. *Id.* at 486. At times, Area Leaders asked franchisees to

3   temporarily close stores that exhibited imminent food safety hazards. They also recommended that

4   Domino's send a notice of default when stores did not follow contractually required procedures. *Id.*

5          The Area Manager testified that when she encountered a franchisee employee whose

6   performance was so deficient that it hurt the Domino's® brand or endangered the franchise, she

7   recommended or suggested to the franchisee that the employee might not be "the right person for the

8   job." *Id.* The franchisee testified that he felt compelled to follow the Area Leader's

9   recommendation. *Id.* at 486, 505. Domino's provided its franchisees' employees with orientation

10  materials, including training on pizza making, store operations, safety and security and driving

11  instructions. *Id.* at 501. Finally, the evidence demonstrated that Domino's was aware of, and took

12  an interest in, the complaint of sexual harassment that led to the lawsuit, with the Area Manager

13  making suggestions about how the franchisee should respond to the complaint and what should be

14  done with the alleged harasser. *Id.* at 485. Based on all of this evidence, the plaintiff in *Patterson*

15  argued that "the degree of control exercised by franchisors like Domino's makes each franchisee the

16  agent of the franchisor for all business purposes, and renders each employee of the franchisee and

17  employee of the franchisor in vicarious liability terms." *Id* at 496.

18         The Supreme Court disagreed. While the Court found that Domino's had

19  implemented "a comprehensive operating system" that included "standards, procedures and

20  requirements" regulating the way the franchisee operated his store, the Court nonetheless held that

21  Domino's was not liable for the sexual harassment as a matter of law because ***the franchisee***

22  ***retained control over the traditional employer functions of recruiting, hiring, training, scheduling,***

23  ***supervising and paying its employees***. *Id.* at 503. In addition, the Court determined that the

24  franchisee adopted the harassment policy at issue, provided harassment training to its employees and

25  had the authority to impose discipline on those who violated the policy. *Id.* at 502-504. "Hence,

26  there [was no] triable issue of fact that an employment or agency relationship existed between

27  Domino's and [franchisee] and its employees in order to support Patterson's claims against

28  Domino's on vicarious liability grounds." *Id.* at 503.

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

Here, the undisputed evidence shows that the Moving Defendants did *not* retain or assume a general right of control over the hiring, supervision, discipline, termination and other day-to-day aspects of managing MM879's employees. Like the harassment policy in *Patterson*, the Moving Defendants did not control the instrumentality of Plaintiffs' alleged harm – MM879's meal and rest period practices, its pay plan and/or its wage statements. Mr. Skadburg testified that he, with the assistance of BBSI, devised and implemented the employee handbook, without input from Merry Maids, and that he understood he was free to compensate his employees in any (lawful) manner he chose. Furthermore, Mr. Skadburg provided several examples of changes he made to MM879's pay practices without consulting Merry Maids. (Skadburg Depo. I, p. 190:24-200:23, 66:25-71:9, 149:13-150:8, 179:9-181:5, 58:2-59:22, 262:9-12.) The Operations Manual and training materials Merry Maids provides to its franchisees contain best practices, suggestions, and recommendations regarding Merry Maids® brand with the goal of "build[ing] and keep[ing] customer trust by ensuring consistency and uniformity in the quality of goods and services," which benefit both parties to a franchise agreement. *See Patterson, supra,* 60 Cal.4th at 490. Further, Moving Defendants did not actually exercise any control over the day-to-day aspects of managing MM879's employees. Perhaps the most compelling evidence that the Moving Defendants were not in control of MM879's pay practices is that when Merry Maids notified Mr. Skadburg that its company-owned California branches would be paying a guaranteed base plus performance incentives, Mr. Skadburg initially opted not to modify his pay practices – waiting years to do so. Under *Patterson,* the Moving Defendants have no liability as a matter of law.

The rationale expressed in the *Patterson* decision was extended in *Vann v. Massage Envy Franchising LLC* (S.D. Cal. January 6, 2015) 2015 U.S. Dist. LEXIS 1002, a case in which the employees of a franchisee asserted the franchisor was liable for a variety of wage and hour violations. The facts in the *Vann* case are strikingly similar to this matter. The franchisor controlled many aspects of the franchisee's operation through a Franchise Agreement, Operations Manual and other documents that "contain[ed] mandatory and suggested specifications, standards, operating procedures and rules that [MEF] periodically prescribe[s] for operating a [franchise]." *Id.* at *1. The Franchise Agreement explicitly defined the franchisee as an "independent contractor' and stated

1  it had "no authority, express or implied, to act as an agent of [the franchisor]," and that parties did

2  not intend to be "partners, associates, or joint employers in any way." *Id.* at \*2.  It was undisputed

3  that the franchisor required franchise owners to conform to franchise standards, including the

4  performance of mandatory background checks of potential massage therapists, the implementation of

5  standard business hours for all franchise locations, the use of a sample script for massage therapists

6  to use when interacting with clients and guests, and the use of only certain types of products.  *Id.*

7  The Operations Manual in *Vann* also included information about a pay policy, but further stated,

8  "[f]ranchisees are responsible for hiring, managing and compensating their employees within the law

9  and are encouraged to consult their own legal counsel to ensure their compliance with all applicable

10  laws," noted that California has more stringent rules regarding piece-rate payments, and urged

11  franchisees who intend to implement a piece-rate pay policy to consult with legal counsel. *Id.* at \*1.

12  The Franchise Agreement also stated that it was the franchisee's responsibility to determine whether

13  any suggested personnel policies are applicable in the franchisee's jurisdiction.  *Id.* at \*2.  Finally,

14  the plaintiff and all other franchise employees testified that they never had any interactions with the

15  franchisor, and the plaintiff admitted the franchisee had hired and fired him, signed his pay checks

16  and created his daily work schedule and assignments.  *Id.* at \*7.

17        Ultimately, the court in *Vann* granted summary judgment in the franchisor's favor,

18  concluding that no evidence indicated that the franchisor exercised any involvement with the terms

19  of the plaintiff's employment.  *Id.* at \*7.  The franchisor's enforcement of policies intended to assist

20  in brand uniformity were expected in the franchise context and did not show that the franchisor

21  controlled daily operations.  *Id.* at \*8.  Finally, while the plaintiff presented evidence regarding the

22  payment policies at franchise locations throughout California, the court observed that this evidence

23  negated plaintiff's contention that the franchisor controlled the pay policy.  The evidence showed

24  that different franchisees changed their policies at different times, and the court held, "***The lack of***

25  ***uniformity among these locations suggest that [the franchisor] did not control employee wages***

26  ***and hours but, rather, left the responsibility to the franchise owners.***"  *Id.*  (emphasis added).

27        As in *Vann*, the Franchise Agreement between Merry Maids and MM879 expressly

28  disclaims a joint venture or agency relationship, and states the franchisee shall be an "independent

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

17.

(CASE NO.  1:15-CV-01563—TLN-EPG )

contractor." It also states that MM879 shall "[c]omply at all times with all federal, state and municipal laws, regulations, ordinances, orders, and rulings." As in *Vann*, the Operations Manual referenced in the Franchise Agreement contains mandatory and suggested specifications, standards, operating procedures and rules for operating a Merry Maids® franchise, including the requirement that employees successfully pass a criminal background check. Plaintiffs also admittedly had absolutely no contact or interactions with anyone from the Franchisor or any of the other Moving Defendants. Moreover, as in *Vann*, the Merry Maids® franchisees in California utilize different methods for calculating employee compensation. Some used straight hourly and overtime wage calculations. (Luders Decl., ¶ 4.) Other franchisees paid hourly wages plus a percentage of each house cleaned, and others paid a percentage of each house cleaned with a minimum guarantee. (*Id.*) Franchisees also utilize a number of different pay components, including carpet cleaning, comment cards, driving bonus, expenses, laundry, and performance incentives, among others. (Declaration of Leslie Perry in Support of Defendant BBSI's Opposition to Motion to Certify Class Action, ¶¶ 4-5, attached as Exhibit I to the Muraco Decl.) With regard to mileage expenses, some franchisees consistently reimbursed using the IRS rate and others used other rates or methods for calculating reimbursement. (Luders Decl., ¶ 5.) The wide variances among Merry Maids® franchisees' pay practices shows that the franchisor "did not control employee wages and hours but, rather, left the responsibility to the franchise owners," *as was expressly noted in multiple communications Merry Maids sent to its California franchisees. Vann, supra*, 2015 U.S. Dist. LEXIS 1002 at *8; Luders Decl., Exh. 1 ("your compensation rates and plans can be unique to your operation providing you are in compliance with state and federal law"); Newhouse Depo., p. 241:8-242:6 and Exh. 28 thereto (advising franchisees, "[a]s a business owner, it is your decision whether [using the IRS rate] to reimburse your associates for mileage makes sense for your business").

As in *Patterson* and *Vann*, the undisputed facts in this case demonstrate that the Moving Defendants simply did not exercise control over the alleged instrumentalities of Plaintiffs' harm. As such, Moving Defendants motion for summary judgment must be granted. *Patterson, supra,* 60 Cal.4th at 480, 504 (granting summary judgment dismissing plaintiff's claims that Domino's was liable because its franchisee was its "agent, employee, servant [or] joint venture"

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT          18.          (CASE NO. 1:15-CV-01563—TLN-EPG )

and/or because the franchisee had acted "with the consent and permission" of Domino's, and/or because Domino's had "ratified and approved" the franchisee's actions).

### C.     Defendants Were Not A Joint Employer Of Plaintiffs.

Plaintiffs have also alleged that the Moving Defendants are liable for the alleged violations because they were the joint employers of Plaintiffs in that they "exercised sufficient control over Plaintiffs' wages, hours and working conditions, and/or suffered or permitted Plaintiffs to work". (FAC, ¶ 12.)   In *Martinez, supra,* the California Supreme Court considered when a plaintiff could "recover unpaid wages from persons who contracted with their ostensible employer". 49 Cal.4th at 50.   The Court concluded that "only an employer can be liable" for such violations because "no generally applicable rule of law imposes on anyone other than an employer a duty to pay wages."   *Id.* at 49.   After an exhaustive review of the relevant legislative history, the Court concluded that in order to hold a defendant liable for wage and hour violations, an employee-plaintiff must prove that the defendant: (a) suffered or permitted the plaintiff to work; (b) exercised control over the plaintiff's wages, hours or working conditions; or (c) engaged the plaintiff to work, thereby creating a common law employment relationship.   *Id.* at 64.   The undisputed evidence demonstrates that Plaintiffs cannot make any such showing in this case.

### 1.     The Moving Defendants Did Not Suffer Or Permit Plaintiffs To Work.

The basis for liability under the "suffer or permit" standard "is the defendant's knowledge of and *failure to prevent* the work from occurring."   *Martinez, supra,* 49 Cal.4th at 70. Where, as here, a defendant lacks "the power to prevent plaintiffs from working," it cannot be found to have "suffered or permitted" them to work.   *Id.*

In *Martinez,* the plaintiffs were seasonal agricultural workers who were employed by Isidro Munoz ("Munoz") during the 2000 strawberry season.   *Id.* at 42.   Munoz had contractual relationships with the defendant merchants whereby each acted as a produce broker, selling Munoz's strawberries for a commission and remitting to him the net proceeds.   *Id.* at 44.   Munoz owned his equipment and paid his own business expenses.   *Id.* at 43.   On the occasions where the defendant-merchants paid Munoz's expenses in the first instance, they billed him.   *Id.*   Each defendant-merchant provided cash advances to Munoz that allowed him to operate during the 2000 season.   *Id.*

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR IN THE ALT., PARTIAL SUMMARY JUDGMENT

19.

(CASE NO.  1:15-CV-01563—TLN-EPG )

1    at 44.  However, Munoz alone, "hired and fired his employees, trained them when necessary, told

2    them when and where to report to work, when to start, stop and take breaks, provided their tools and

3    equipment, set their wages, paid them, handled their payroll and taxes, and purchased their workers'

4    compensation insurance." *Id.* at 45.  Munoz and his foremen also supervised his employees. *Id.*

5            The plaintiffs argued that the defendant-merchants participated in the supervision of

6    Munoz's employees because they "regularly sent field representatives to ascertain the quality of the

7    available strawberries and to explain the manner in which they were to be packed." *Id.*  At one point

8    in the season, Munoz's employees stopped working because they had not been paid. *Id.* at 46.  One

9    of the defendant's field representatives came to the field where the stoppage was in effect, told

10   Munoz's workers "to keep working and help Munoz," and provided assurances that the defendant

11   merchants would make payments to Munoz in the near future that would allow him to pay the

12   unpaid wages. *Id.* at 47.  The field representative also spoke with individual workers, telling them

13   "if all of you stop right now, the strawberries are going to go to waste.  And they won't be able to

14   pay you." *Id.*  After the field representative spoke, several of Munoz's employees returned to work.

15           Under these facts, the Court in *Martinez* concluded that the defendant-merchants had

16   not "suffered or permitted" the plaintiffs' work.  Specifically, the Court reasoned:

17           [N]either [defendant] suffered or permitted plaintiffs to work because neither
             had the power to prevent plaintiffs from working.  Munoz and his foremen had
18           the exclusive power to hire and fire his workers, to set their wages and hours,
             and to tell them when and where to report to work.  Perhaps [the defendants],
19           by ceasing to buy strawberries, might as a practical matter have forced Munoz
             to lay off workers or to divert their labor to other projects....But any substantial
20           purchaser of commodities might force similar choices on a supplier by
             withdrawing its business.  Such a business relationship, standing alone, does
21           not transform the purchaser into the employer of the supplier's workforce.

22   *Id.* at 70.  The Court found it irrelevant that the defendants had benefitted from the plaintiffs' labor,

23   holding that "the concept of downstream benefit" was not "a sufficient basis for liability". *Id.*

24           As in *Martinez*, the undisputed facts in this matter show that none of the Moving

25   Defendants had the power to prevent Plaintiffs from working.  As Mr. Skadburg testified, his family

26   and the managers they hired were the only ones with the power to hire or fire MM879's employees,

27   to set their wages and hours, and to tell them when and where to report to work.  Accordingly,

28   Plaintiffs cannot prevail under a "suffer and permit" theory of liability.

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT                    20.          (CASE NO.  1:15-CV-01563—TLN-EPG )

1

### 2.   The Moving Defendants Did Not Exercise Control Over Plaintiffs' Wages, Hours Or Working Conditions.

2

The plaintiffs in *Martinez* argued that the defendant-merchants, through their

contractual relationship with Munoz, "dominated his business financially and thus exercised indirect

control over his employees' wages and hours." *Martinez, supra,* 49 Cal.4th at 71.   The plaintiffs

sought "to portray Munoz as a straw man, engaged by [the defendant-merchant] to shield itself from

agricultural workers' wage claims." *Id.*   The Court rejected that argument, noting that the Wage

Order's definition of "employer" was "broad enough to reach through straw men and other sham

arrangements to impose liability for wages on the actual employer," but found that the plaintiffs had

failed to "establish that [the defendant-merchant's] business relationship with Munoz allowed the

company to exercise control over Munoz's employees' wages and hours." *Id.* at 72.

The same is true in this case.   Far from a "sham arrangement," the relationship

between Merry Maids LP and MM879 is a business format franchise that has been recognized as a

valid and beneficial part of the U.S. economy. *Patterson, supra,* 60 Cal.4th at 488-491.   The

Skadburg family, not the Moving Defendants, "hired and fired [P]laintiffs, trained and supervised

them, determined their rate and manner of pay…, and set their hours, telling them when and where

to report to work and when to take breaks". *Martinez, supra,* 49 Cal.4th at 72 (explaining why the

defendant-merchant did not qualify as plaintiffs' employer under California's wage and hour laws).

The defendants in *Martinez* had much more interaction with the plaintiff-employees

than the Moving Defendants ever did.   Because picking and packing strawberries necessitated close

communications during the harvest between defendants and Munoz's personnel, the defendants

regularly sent its representatives to the field on days when Munoz was harvesting berries. *Id.* at 76.

> In the morning, the representatives would explain to Munoz and his foremen how the merchant wanted strawberries packed, and Munoz and his foremen would demonstrate the packing style to the workers.   For about an hour, the representatives, together with Munoz and his foremen, would check the packed containers as workers brought them from the field to the truck where they would be loaded for shipping.   While the representatives would generally bring problems to the attention of Munoz and his foremen, they would also sometimes speak directly to the workers, pointing out mistakes in packing such as green or rotten berries.   In the afternoon, the representatives would return briefly to check the quality and quantity of the berries in the loaded truck.

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

21.

(CASE NO.  1:15-CV-01563—TLN-EPG )

1    *Id.* In finding such evidence insufficient to impose liability on the defendants, the Court reasoned:

> While the evidence indicates that [the defendants'] field representatives spoke with Munoz's employees about the manner in which strawberries were to be packed, it does not indicate the field representatives ever supervised or exercised control over his employees. No evidence suggests Munoz's employees viewed the field representatives as their supervisors or believed they owed their obedience to anyone but Munoz and his foremen. Plaintiffs, relying on cases interpreting other bodies of law, argue the *right* to exercise control over the manner in which work is performed is sufficient to prove the existence of an employment relationship, whether or not the right is exercised. But even assuming the same rule applies here, Munoz's contracts with [the defendants] gave the merchants no right to direct his employees' work. Neither does any evidence in the record suggest that *anyone*—Munoz, [the defendants], the merchants' field representatives, or plaintiffs—believed the merchants or their representatives had such a right. Confusion on this point was not likely to arise, since Munoz and his foremen were present when the field representatives interacted with Munoz's employees. For all of these reasons, we conclude the claim lacks merit.

11   *Id.* at 76-77.

12          In this case, Plaintiffs admitted that they had absolutely zero direct contact or

13   communication with anyone from the Moving Defendants. Plaintiffs likewise admitted that Jeff and

14   Jason Skadburg and Juanita Gonzalez, the manager of MM879's Fresno location, were the *only*

15   individuals who provided supervision, instruction, coaching, training, direction or management of

16   their daily job activities. (Plaintiffs' Rog Responses Nos. 3-5, p. 12-13.)

17          In another recent decision, *Ochoa v. McDonald's Corp.*, 133 F.Supp.3d 1228 (2015),

18   the court reviewed this prong of *Martinez* in detail in assessing the plaintiffs' wage and hour

19   violations against the franchisor, McDonald's. The Court focused on the plaintiffs' argument that

20   McDonald's exercised control over the franchise employees pursuant to is "power to terminate

21   franchise agreements" and to "decline to renew existing franchise agreements or enter into new

22   ones." *Id.* at 1235. The court disagreed, holding:

> [I]t is clear that McDonald's has the ability to exert considerable pressure on its franchisees. It can try to influence a franchisee in many ways, up to and including termination of the business relationship. But **the evidentiary showings about McDonald's strength as a franchisor do nothing to negate or call into question the dispositive fact that the authority to make hiring, firing, wage, and staffing decisions at the Smith restaurants lies in Smith and its managers—and in them alone.**

27   *Id.* at 1236 (emphasis added). In sum, whether or not a franchise agreement retains the franchisor's

28   right to terminate the business relationship, the determinative question in assessing franchisor

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT                22.            (CASE NO. 1:15-CV-01563—TLN-EPG )

1    liability for the employment-related claims of franchise employees is whether the franchisor in fact

2    "exercise[d] control over … wages, hours, or working conditions." *Id.* at 1237, quoting *Martinez*, 49

3    Cal.4th at 64. The evidence in *Ochoa*, including the fact that McDonald's insists on being the owner

4    and primary leaseholder for its locations, allowing it to enter the premises at any time, and that

5    franchisees are required to use McDonald's-provided software that had pre-programmed settings that

6    likely caused the labor law violations at issue in the case, were insufficient as a matter of law to

7    show that McDonald's was a joint employer of the plaintiffs. *Id.* at 1237.

8          Here, the language of the Franchise Agreement giving Merry Maids the right to

9    terminate the franchise relationship has no relevance to the evidence that, as discussed above,

10    conclusively demonstrates that the Moving Defendants did not exercise control over Plaintiffs'

11    wages, hours, or working conditions. In short, there is no basis for concluding that the Moving

12    Defendants actually supervised or exercised control over MM879's employees in a manner that

13    would justify imposing liability upon them for alleged wage and hour violations by MM879.

14          **3.    The Moving Defendants Did Not Engage The Plaintiffs To Work.**

15          The Court in *Martinez* held that in the wage and hour context, "the verb 'to engage'

16    has…its plain, ordinary sense of 'to employ,' that is to create a common law employment

17    relationship." *Martinez, supra,* 49 Cal.4th at 64. By including one who engages someone to work

18    within the definition of "employer," the IWC simply intended to extend "protection [to] the regularly

19    hired employees who undoubtedly comprise the vast majority of the state's workforce." *Id.*

20          Plaintiffs have not asserted that the Moving Defendants were Plaintiffs' direct or

21    regular employer. (FAC, ¶¶ 11-14.) Nor could they make such an assertion in good faith since the

22    undisputed facts show that MM879 was the entity that hired and directly employed the Plaintiffs.

23       **D.    MM879 Is Not The Alter Ego Of The Moving Defendants.**

24          To hold one entity liable for the acts of another under an alter ego theory:

25         [It] must be made to appear that the corporation is not only *influenced and*
26         *governed* by that person [or other entity] but that there is such a *unity of interest*
          *and ownership* that the individuality, or separateness, of such person and
27         corporation has ceased, and the facts are such that an adherence to the fiction of
          the separate existence of the corporation would, under the particular
28         circumstances, sanction a *fraud or promote injustice.*

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

23.

(CASE NO.  1:15-CV-01563—TLN-EPG )

1   *Roman Catholic Archbishop of San Francisco v. Superior Ct.*, 15 Cal.App.3d 405, 411 (1971)

2   (italics original); *Laird v. Capital Cities/ABC*, 68 Cal.App.4th 727, 742 (1998).   The alter ego

3   doctrine is considered an "extreme remedy, sparingly used." *Sonora Diamond Corp. v. Superior Ct.*,

4   83 Cal.App.4th 523, 539 (2000).   Courts apply it when a "party is using the corporate form unjustly

5   and in derogation of the plaintiff's interests." *Mesler v. Bragg Mgmt. Co.*, 39 Cal.3d 290, 300

6   (1985).   Here, Plaintiffs would have to show "specific manipulative conduct" by the Moving

7   Defendants toward MM879 which "relegate[s] the latter to the status of merely an instrumentality,

8   agency, conduit or adjunct of the former . . . ." *Laird, supra*, 68 Cal.App.4th at 737.

9            Plaintiffs would also have to show that inequity would result by rejecting liability.

10  > The alter ego doctrine does not guard every unsatisfied creditor of a corporation
11  > but instead affords protection where some conduct amounting to bad faith
    > makes it inequitable for the corporate owner to hide behind the corporate form.
    > Difficulty in enforcing a judgment or collecting a debt does not satisfy this
12  > standard.

13  *Sonora Diamond Corp., supra*, 83 Cal.App.4th at 538-39.   Such a showing is required because

14  California courts have consistently held that "the corporate form will be disregarded only when the

15  ends of justice require [that] result." *Laird, supra*, 68 Cal.App.4th at 737.   Because "society

16  recognizes the benefit of allowing persons and organizations to limit their business risks through

17  incorporation, sound public policy dictates that imposition of alter ego liability be approached with

18  caution." *Las Palmas Assocs. V. Las Palmas Ctr. Assocs.*, 235 Cal.App.3d 1220, 1249 (1991).

19           In support of their alter ego argument, Plaintiffs included a series of rote and wholly

20  unsupported allegations in their Complaint.   Specifically, Plaintiffs alleged that MM879 and the

21  Moving Defendants: 1) commingled funds and other assets for their own convenience and to assist

22  in evading payment of obligations; 2) diverted funds and other assets to other than corporate uses; 3)

23  treated each other's assets as their own; 4) failed to maintain minutes or adequate corporate records

24  and otherwise ignored corporate formalities in using each other as alter egos; 5) failed to adequately

25  capitalize or provide any assets to the various entities; 6) used each other as a mere shell,

26  instrumentality, or conduit by which to avoid liability for their various violations of California law,

27  including, but not limited to violations of the California Labor Code; 7) diverted assets from one

28  entity to another to the detriment of creditors, including Plaintiffs; and 8) employed and otherwise

LITTLER MENDELSON, P.C.
O W. San Fernando, 15th Floor
San Jose, CA 95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

24.

(CASE NO.  1:15-CV-01563—TLN-EPG )

1 | exploited the labor and services of Plaintiffs with the intent to avoid liability for violating California

2 | law by use of the corporate entities as a shield against personal liability. (FAC, ¶ 14.) Significantly,

3 | Plaintiffs cite zero factual evidence to support these conclusory allegations.

4 | As discussed above, MM879 is an independently owned and operated Merry Maids®

5 | franchisee operating pursuant to a written Franchise Agreement in a manner that the Court in

6 | *Patterson* recognized as widely accepted, common-place and legitimate.  Defendant MM879 is a

7 | separate legal entity (corporation) from Merry Maids LP, MM Maids LLC and ServiceMaster.

8 | (Newhouse Decl., ¶ 5).  The Moving Defendants have no ownership or partnership stake in MM879.

9 | (*Id.*)  MM879 does not have any officers or directors in common with the Moving Defendants.  (*Id.*)

10 | None of the Moving Defendants have access to MM879's bank accounts.  (*Id.*)  MM879 files its

11 | own tax returns and obtains all necessary business licenses and operating permits.  (*Id.*)  While

12 | MM879 pays franchise and other fees for services provided by Merry Maids, LP under the Franchise

13 | Agreement, MM879 and the Moving Defendants do not share profits or losses.  (*Id.*)  Furthermore,

14 | MM879 is responsible for obtaining securing and paying for its own liability, workers'

15 | compensation and other insurance.  (Skadburg Depo, p. 213:25-214: 12 and Exh. 11, ¶ 13.)

16 | Plaintiffs simply cannot show sufficient unity of interest and ownership between

17 | MM879 and the Moving Defendants to warrant imposition "extreme remedy" of alter ego liability.

18 | Nor can they make the necessary showing of inequity.  Accordingly, Plaintiffs' alter ego theory is

19 | not tenable and must be dismissed as a matter of law.

20 | **V.    CONCLUSION**

21 | As set forth above, there is no legal basis for holding Defendants Merry Maids

22 | Limited Partnership, MM Maids, LLC or ServiceMaster Company LLC liable for any wage and hour

23 | violations that Defendant MM879 may have committed against Plaintiffs.  Accordingly, all claims

24 | against the Moving Defendants' should be dismissed as a matter of law.

25 | Dated: September 8, 2016

26 | By: */s/ Marlene S. Muraco*

27 | MARLENE S. MURACO
Attorneys for Defendants

28 |

Firmwide:142617044.1 053274.1067

LITTLER MENDELSON, P.C.
0 W. San Fernando, 15th Floor
San Jose, CA  95113.2303
408.998.4150

DEFTS' NOTICE OF MOTION AND MOTION
FOR SUMMARY JUDGMENT, OR IN THE ALT.,
PARTIAL SUMMARY JUDGMENT

25.

(CASE NO.  1:15-CV-01563—TLN-EPG )