UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA CRUZ, *et al.*, | Case No. 1:15-cv-01563-TLN-EPG |
| Plaintiffs, | ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF CLASS CERTIFICATION AND APPROVAL OF A CLASS ACTION SETTLEMENT |
| v. | |
| MM 879, INC., *et al.*, | |
| Defendants. | (ECF Nos. 253, 256) |

The parties have reached a settlement in this putative class action case that primarily alleges California state labor law violations. Now before the Court is Plaintiffs' unopposed motion to preliminarily certify the settlement class and approve the parties' proposed settlement.[1] (ECF No. 253). The parties have agreed to the undersigned "conducting all proceedings related to the approval and administration of the Parties' [settlement], including entry of final judgment, with direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed." (ECF No. 252).

On May 30, 2025, the Court heard argument on the motion and permitted Plaintiffs to file a supplement, which they filed on June 6, 2025. (ECF Nos. 255, 256). Upon review of Plaintiffs' motion, their supplement, and the record, the Court will grant the motion. (ECF No. 253).

---

[1] Plaintiffs also include other requests, *e.g.*, authorizing notice to the class members, which will be discussed below.

1

1  I.  **BACKGROUND**

2  A.  **Procedural History**

3  Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz, and Christine Goodman generally

4  allege that they have suffered California Labor Code violations in connection with their

5  employment as cleaners. (ECF No. 94). They filed this case in the Fresno County Superior Court

6  on April 6, 2011.[2] (ECF No. 253-1, p. 8; ECF No. 3-2, p. 2). This case was heavily litigated in

7  state court for approximately four-and-a-half years before certain Defendants removed it to this

8  Court on October 14, 2015. (ECF No. 253-1, pp. 8-9). Among other things, the state court

9  litigation involved (1) extensive discovery necessitating the appointment of a special master, (2)

10  dispositive motion practice, including summary judgement motions concerning whether certain

11  Defendants employed Plaintiffs, and (3) the filing of petition for writ of mandate to the Fifth

   District Court of Appeal. (*Id.*).

12  Following removal, Plaintiffs filed their operative fifth amended complaint against the

13  following Defendants: (1) MM 879; (2) Barrett Business Services, Inc. (BBSI); (3) The

14  Servicemaster Company LLC; (4) Merry Maids LP; and (5) MM Maids LLC. (ECF No. 94, p. 1).

15  The latter three Defendants, collectively referred to as the Merry Maids Defendants, were

16  ultimately dismissed from this case, as further explained below.

17  Plaintiffs alleged that the Defendants named in their operative complaint jointly employed

18  them. (*Id.* at 4). Plaintiffs brought Causes of Action 1-6, 8, and 9 on behalf of themselves and

19  putative class members:

20  (1) Failure To Pay Minimum Wages In Violation Of Labor Code §§ 1197, 1194 &
   1194.2;

21  (2) Failure To Pay Overtime In Violation Of Labor Code § 510;

22  (3) Failure To Provide All Mandated Meal Periods Or Additional Wages In Lieu
   Thereof;

23  (4) Failure To Provide All Mandated Rest Periods Or Additional Wages In Lieu
24   Thereof;

25  (5) Failure To Issue Accurate Wage Statements In Violation Of Labor Code § 226;

26  (6) Failure To Timely Pay Wages Due At Termination In Violation Of Labor Code
   §§ 201, 202 & 203;

27

28  [2] Plaintiff Christie Goodman was later added as a plaintiff in the third amended complaint. (ECF No. 253-1, p. 8).

1    (8) Unfair Competition (Bus. & Prof. Code § 17200);

2    (9) Declaratory Relief

3    (*Id.* at 1-2, 6).[3]

4        Plaintiff also brought Causes of Action 10-18 under California's Private Attorneys

5    General Act (PAGA), Cal. Lab. Code § 2698-2699.5, "which allows aggrieved employees to

6    recover civil penalties for Labor Code violations on behalf of themselves, the state, or other

7    current or former employees." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th

     1013, 1017 (9th Cir. 2022); (ECF No. 94, p. 2).

8
9        As in state court, this case has been heavily litigated here. Among other things, following

10   substantial briefing from the parties, the assigned District Judge granted Plaintiffs' motion for

     class certification on January 18, 2019. (ECF No. 161, p. 14). The same day, the District Judge

11   denied the Merry Maids Defendants' motion for summary judgment regarding whether they

12   employed Plaintiffs. (ECF No. 162). While the District Judge concluded that while the Merry

13   Maids Defendants were entitled to summary judgment under a joint-employer theory of liability,

14   there existed a triable issue of fact as to whether they could be liable based on an ostensible-

15   agency theory. (*Id.* at 14, 16).

16       Thereafter, the Merry Maids Defendants moved for reconsideration, which motion the

17   District Judge granted, along with their prior motion for summary judgment, based on recent

18   authority from the Ninth Circuit concluding that a franchisor could not be held liable for wage-

19   and-hour violations under an ostensible-agency theory. (ECF No. 182, p. 7, citing *Salazar v.

20   McDonald's Corp.*, 944 F.3d 1024 (9th Cir. 2019)).

21       Defendant BBSI, which provided certain services to Defendant MM 879's employees

22   (*i.e.*, payroll processing, human resource consulting, workers' compensation insurance coverage)

23   moved for summary judgment on October 9, 2019, arguing that it did not employ Plaintiffs. (ECF

24   No. 175). The District Judge granted that motion on November 30, 2020. (ECF No. 192).

25       Plaintiffs appealed the dismissal of the Merry Maids Defendants and BBSI from the case.

26   (ECF No. 202). On June 2, 2022, the Ninth Circuit affirmed the District Judge's grant of

27   summary judgment to the Merry Maids Defendants but reversed as to the grant of summary

28   _____

[3] Cause of Action 7—failure to provide expense reimbursements—was later dismissed by the assigned
District Judge. (ECF No. 161, p. 14).

3

judgment to BBSI. (ECF No. 205, p. 3). As to BBSI, the Ninth Circuit held that "the district court . . . erred in concluding as a matter of law that BBSI did not establish a common law employment relationship with Plaintiffs" based, in part, on "evidence that BBSI retained the right to terminate MM 879 employees with or without cause, even if it did not exercise that right." (*Id.* at 4, 5).

Following remand by the Ninth Circuit, the only remaining Defendants in this case are MM 879 and BBSI. The District Judge issued a scheduling order in August 2022 and approved a class notice plan in March 2023. (ECF Nos. 209, 217). On February 13, 2024, Plaintiffs filed a motion for summary adjudication seeking to establish that BBSI was a joint employer of Plaintiffs and MM 879 and BBSI are liable for various wage and hour violations. (ECF No. 228). However, the District Judge held that motion in abeyance while the parties attempted to settle the case. (ECF No. 246).

Ultimately, the parties reached a settlement, and the District Judge deemed the motion for summary adjudication moot. (ECF No. 249). The parties stipulated to a limited consent of the undersigned handling proceedings regarding the approval and administration of their settlement. (ECF No. 252). On April 24, 2025, Plaintiffs filed their motion for preliminary approval, which includes a request for class certification. (ECF No. 253). The settlement provides for a gross amount of $995,000.

In support of the motion, Plaintiffs provide their declarations, the declarations of their counsel, the declaration of the President of the company that Plaintiffs propose as the settlement administrator, their proposed class notice, and their settlement agreement.

The Court held a hearing on Plaintiffs' motion on May 30, 2025. (ECF No. 255). After the hearing, the Court asked Plaintiffs to provide a supplement addressing (1) the number of aggrieved employees; (2) compliance with CAFA's notice requirements under 28 U.S.C. § 1715(b); and (3) the opt-out form mentioned in the class action notice. (ECF No. 255). Plaintiffs filed a supplement on June 6, 2025. (ECF No. 256). Accordingly, the matter is now ripe for decision.

\\\

\\\

\\\

4

**B.    Overview of the Settlement Agreement**

      **1.    Proposed settlement class and class period; aggrieved employees and PAGA period**

The proposed settlement class of an estimated 364 class members "includes all non-exempt employees of MM 879, Inc., who performed work in California from April 6, 2007, through January 18, 2019."[4] (ECF No. 253-1, p. 13).

In their supplement, Plaintiffs estimate the number of aggrieved employees to be 137, which includes "all non-exempt employees of MM 879, Inc., who performed work in California from May 9, 2010, through January 18, 2019." (ECF No. 253-2, p. 39; ECF No. 256, p. 2).

      **2.    Terms of the settlement agreement**

As noted above, the GSA is $995,000. The agreement proposes that the gross settlement amount be allocated as follows:

|  | Settlement Allocation |
|---|---|
| GSA | $995,000 |
| Attorney Fees Not to Exceed 1/3 of GSA | $331,666.66 |
| Litigation Costs Not to Exceed | $130,000 |
| Administrator Costs Not to Exceed | $7,950 |
| PAGA Penalties | $75,000 total (75% (or $56,250) of total to LWDA[5] and 25% (or $18,750) to Aggrieved Employees) |
| Class Representative Award Not to Exceed | $100,000 total ($25,000 for each of the Plaintiffs) |
| **Expected Net Settlement Amount for Estimated 364 Class Members** | **$350,383.34** |

(ECF No. 253-1, pp. 6, 13, 16).

Settlement shares will be allocated for the class members and aggrieved employees as

---

[4] The Court has made minor alterations to some of the Plaintiffs' quotations, such as changing capitalization and omitting internal citations, without indicating each change.

[5] LWDA stands for the California Labor Workforce and Development Agency.

follows:

> The Settlement Administrator will calculate each Class Member's Individual Settlement Payment by (a) dividing the Net Class Settlement Fund by the total number of weeks worked by all Settlement Class Members during the Class Period and (b) multiplying the result by each Class Member's Workweeks. The Individual PAGA Payments shall be calculated by (a) dividing the amount of the Aggrieved Employees' 25% share of PAGA Penalties ($18,750) by the total number of Pay Periods of all Aggrieved Employees during the PAGA Period and (b) multiplying the result by each Aggrieved Employee's PAGA Pay Periods.

(*Id.* at 14).

Under the proposed settlement, the average net recovery for a class member would be about $962.59.[6] And the net recovery for an aggrieved employee would be about $136.86.[7]

This is a non-reversionary settlement, meaning that no portion of the GSA will revert to Defendants; for example, if the Court failed to award the full amount of attorney fees, the leftover money would go to the class members, not Defendants. (ECF No. 253-2, pp. 38, 53). As part of the settlement, all class members who do not opt out, and all aggrieved employees, will release claims generally related to the facts underlying this action.[8] (*Id.* at pp. 45-49). Additionally, the individual Plaintiffs waive their rights as to unknown claims under California Civil Code § 1542.[9] (*Id.* at 48).

Settlement payments will be mailed by check, and class members and aggrieved employees will have 180 calendar days after the mailing of the check to cash it. (ECF No. 253-2, pp. 59, 64). If a check is not timely cashed, the funds will be issued to the California Controller's

---

[6] This amount is obtained by dividing the net settlement of $350,383.34 by the estimated 364 class members. Plaintiffs estimate an average of $1,014.10 per class member, but that value improperly adds in the PAGA penalty portion ($18,750) of the settlement to the net settlement amount, which class members will get no share of. (ECF No. 253-1, p. 6).

[7] This amount is obtained by dividing the net PAGA recovery of $18,500 by the estimated 137 aggrieved employees.

[8] Aggrieved employees cannot opt out of the PAGA settlement. *See O'Connor v. Uber Techs.*, Inc., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) ("In short, because the employee's PAGA action acts as a 'substitute' for a governmental action, the judgment binds all those who would be bound by an action brought by the government, including nonparty employees. Thus, in a lawsuit which asserts . . . PAGA claims and seeks class certification for labor/wage claims, even class members who opt out of the class would be bound by an adverse PAGA judgment or settlement.") (citation omitted).

[9] Section 1542 provides as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

1   Unclaimed Property Fund in the name of the person to whom the check was issued. (*Id.* at 64).

2       Within 21 days after the order granting preliminary approval of the settlement, Defendants

3   will provide the Settlement Administrator with data regarding the class members and aggrieved

4   employees. (*Id.* at 55). Within 10 days of the receipt of the data, the Settlement Administrator will

5   mail a notice written in English and Spanish to the last known addresses of class members and

6   aggrieved persons. (*Id.*; ECF No. 253-1, pp. 15, 26). A copy of the proposed notice is attached to

7   Plaintiffs' motion and they have provided a copy of the settlement opt-out form with their

8   supplement. (ECF No. 253-2, p. 77; ECF No. 256, p. 14).

## II.   LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT AND APPROVAL OF PAGA REPRESENTATIVE ACTION

10       A court tasked with determining whether to approve a proposed class action settlement

11  will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d

12  1218, 1223 (9th Cir. 2015). "On the one hand, . . .  there is a strong judicial policy that favors

13  settlements, particularly where complex class action litigation is concerned." *Id.* (internal

14  quotation marks and citations omitted). "But on the other hand, settlement class actions present

15  unique due process concerns for absent class members, and the district court has a fiduciary duty

16  to look after the interests of those absent class members." *Id.* (internal quotation marks and

17  citations omitted). "To ensure the interests of the absent class members are properly safeguarded,

18  the judge must adopt the role of a skeptical client and critically examine the class certification

19  elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys*

20  *Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2021 WL 2210724, at *2 (E.D. Cal. June 1,

    2021) (internal quotation marks and citation omitted).

21       Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to

22  approving a class action settlement. In the first stage, at issue here, "the court preliminarily

23  approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and

24  authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). At the

25  second stage, the Court holds a fairness hearing, entertaining objections from putative class

26  members, and thereafter making "a final determination as to whether the parties should be

27  allowed to settle the class action pursuant to the terms agreed upon." *Id.*

28       "Parties seeking class certification must satisfy each of the four requirements of Rule

23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements of Rule 23(b)," with Plaintiffs arguing here that, under Rule 23(b)(3), common questions of law or fact predominate over individual class member questions and that a class action is superior to other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 253-1, p. 20). Plaintiffs bears the burden of showing these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir. 1977).

After the certification inquiry, the Court considers whether the settlement is "fair, reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir. 2021) (describing factors guiding inquiry under Rule 23(e)(2)); *see also Gonzalez v. NCI Grp.*, Inc., No. 1:18-CV-00948-AWI-SKO, 2020 WL 4547303, at *9 (E.D. Cal. Aug. 6, 2020) (internal quotation marks and citation omitted) (noting that some courts decline to consider all the Rule 23(e)(2) factors at the preliminary-approval stage but agreeing with courts who reason that "it is better to closely scrutinize the settlement terms at the earliest opportunity so that if a fatal flaw exists, it can be addressed before the parties waste a great deal of time and money in the notice and opt-out process").

The Court will evaluate the settlement agreement "as a whole" and "for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011). The Court does "not have a duty to maximize settlement value for class members," but instead, the "inquiry is much more modest and limited to ensuring that the class settlement is fair, reasonable, and adequate." *In re California Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 678 (9th Cir. 2025). Relatedly, the Court does not "have the ability to delete, modify or substitute certain provisions"; rather, "[t]he settlement must stand or fall in its entirety." *Id.* (internal citation and quotation marks omitted). "The court may, however, voice its reservations about the proposed settlement and set conditions that, if satisfied, might lead the court to approve it." *Manzo v. McDonald's Restaurants of California*, No. 1:20-CV-1175-HBK, 2022 WL 183492, at *4 (E.D. Cal. Jan. 20, 2022) (citing Manual for Complex Litigation (Fourth) at 309, § 21.61 (2004)).

Plaintiffs' PAGA claims are pursued in a representative capacity and differ from a class

1   action. *See Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73, 86, 459 P.3d 1123, 1130 (2020)

2   ("Although representative in nature, a PAGA claim is not simply a collection of individual claims

3   for relief, and so is different from a class action."); *see also Viking River Cruises, Inc. v. Moriana*,

4   596 U.S. 639, 644 (2022*) (quoting Cal. Lab. Code Ann. § 2699(a) ("PAGA authorizes any

5   'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or

6   herself and other current or former employees' to obtain civil penalties that previously could have

7   been recovered only by the State in an LWDA enforcement action."). "PAGA actions need not

8   satisfy Rule 23 class certification requirements." *Hamilton v. Wal-Mart Stores*, Inc., 39 F.4th 575,

9   583 (9th Cir. 2022).

10          However, PAGA claims still require court approval under California Labor Code

11   § 2699(*l*)(2). This provision also requires a plaintiff to submit a proposed settlement to the

12   LWDA. "Although there is no binding authority setting forth the proper standard of review for

13   PAGA settlements, California district courts have applied a Rule 23-like standard, asking whether

14   the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of

15   PAGA's policies and purposes." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-CV-00588-AWI-

16   BAM, 2022 WL 16701278, at *2 (E.D. Cal. Oct. 24, 2022) (internal quotation marks and

17   citations omitted).

**III.    ANALYSIS**

18          The Court will grant Plaintiffs' motion for preliminary class certification and approval for

19   the reasons discussed below. The Court will begin with the Rule 23(a) factors regarding class

20   certification and then turn to the Rule 23(e) factors regarding approval of the settlement.

21          As an initial matter, the Court notes that the assigned District Judge certified certain

22   classes on January 18, 2019. (ECF No. 161). Specifically, the District Judge certified two classes,

23   with the first class containing six subclasses. (*Id.* at 13). Plaintiffs seek certification here because

24   they only desire to certify a single class, *i.e.*, "all non-exempt employees of MM 879, Inc., who

25   performed work in California from April 6, 2007, through January 18, 2019." (ECF No. 253-1,

26   pp. 13, 18). This definition is similar to one of the classes previously certified by the District

27   Judge: "All current and former non-exempt employees of MM 879 who: (a) Resided within

28   California at any time while performing duties as Home Cleaners, Merry Maids Certified

Cleaners, or Team Members (or equivalent), from April 6, 2007, through the date of certification; and, (b) Are members of one or more Subclasses." (ECF No. 161, pp. 12-13). Defendants agree to certification for settlement purposes. (ECF No. 253-1, p. 18).

### A.    Rule 23(a) Requirements

#### 1.    Numerosity

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit have found the requirement satisfied when the class is composed of as few as thirty-nine members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine, sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other grounds*, 459 U.S. 810, 103 (1982)).

Here, joinder of the 364 estimated class members as plaintiffs would be impracticable. (ECF No. 253-1, p. 18). Thus, the Court finds the numerosity requirement satisfied.

#### 2.    Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350. The "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The claims here are based on company-wide policies and practices that allegedly led to labor violations, such as failure to pay minimum wages. (*See* ECF No. 253-1, p. 18). Thus, the

Court finds the commonality requirement satisfied. *See Kincaid v. Educ. Credit Mgmt. Corp., Inc.*, No. 2:21-CV-00863-TLN-JDP, 2024 WL 1344595, at *4-10 (E.D. Cal. Mar. 29, 2024) (finding commonality requirement met for similar Labor Code claims); *Goodwin v. Winn Mgmt. Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6 (E.D. Cal. July 26, 2017) (same).

### 3.      Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the Ninth Circuit has explained, "[t]he test of typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Jones v. Shalala*, 64 F.3d 510, 514 (9th Cir. 1995) (citing *Hanon*, 976 F.2d at 508).

While representative claims must be "reasonably co-extensive with those of absent class members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Here, as Plaintiffs note, their "claims are predicated on allegedly uniform policies and practices that applied equally to all proposed class members." (ECF No. 253-1, p. 19). The Court finds the typicality requirement satisfied.

### 4.      Adequacy of representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." "[A] class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

Plaintiffs contend that they can adequately represent the class, have contributed to the litigation and will continue to do so, and have no conflicts of interest. (ECF No. 253-1, pp. 19-20). As for Plaintiffs' counsel, "[t]he competence of counsel seeking to represent a class" may be evaluated by considering whether they "are labor lawyers experienced in class actions." *Loc.*

*Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001). Here, Plaintiffs state that their counsel "are highly-qualified attorneys with significant experience litigating wage-and-hour class action cases and in serving as class counsel. Mr. Sutton and Mr. Briggs also both assert that no conflicts of interest have arisen that would preclude them from serving as Class Counsel or compromise the adequacy of their representation of Plaintiffs or the Settlement Class." (ECF No. 253-1, p. 19). Further, counsel have provided declarations listing numerous class action cases they have been involved in. (ECF No. 253-2, p. 30; ECF No. 253-2, pp. 3-5). Accordingly, the Court finds the adequacy requirement satisfied.

### B.    Rule 23(b) Requirements

Plaintiff seeks certification under Rule 23(b)(3), which requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 22, p. 24). The test of Rule 23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

#### 1.    Predominance

First, questions of law or fact common to class members must predominate over any questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)." *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Id.* "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1778 (2d ed.1986)).

1    Here, there are issues that will predominate over individual issues in the case, specifically

2    whether the employment policies at issue violated California law. Because "[a] common nucleus

3    of facts and potential legal remedies dominates this litigation," the Court finds that the

4    predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

### 2.    Superiority

6    Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly

7    and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is:

8    "(A) the class members' interests in individually controlling the prosecution or defense of

9    separate actions; (B) the extent and nature of any litigation concerning the controversy already

10   begun by or against class members; (C) the desirability or undesirability of concentrating the

11   litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class

12   action." *Id.; see Amchem*, 521 U.S. at 616. The purpose of this "requirement is to assure that the

13   class action is the most efficient and effective means of resolving the controversy," and "[w]here

14   recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis,

15   this factor weighs in favor of class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617

16   F.3d 1168, 1175 (9th Cir. 2010) (citation omitted); *see Local Joint Exec. Bd. of

17   Culinary/Bartender Tr. Fund v. Las Vegas Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This

18   case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed

19   as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity

20   between their litigation costs and what they hope to recover.").

21   The Court concludes that a class action is a superior method of resolving this action. First,

22   it does not appear economical for each class member to bring their claims separately. The class

23   action litigation here allows the class members to pool their individual claims together, which

24   claims would otherwise not be economical to litigate. *See Local Joint Exec. Bd. of

25   Culinary/Bartender Tr. Fund v. Las Vegas Sand*s, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This

26   case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed

27   as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity

28   between their litigation costs and what they hope to recover."). Further, lack of knowledge of the

legal system and limited economic resources would also likely deprive most class members of the

13

opportunity to pursue their claims outside of a class action. And any class member that wants to pursue their own case may opt out.

Second, there also does not appear to be any related pending litigation. Third, this District is a desirable forum for the litigation as the operative complaint alleges that "Plaintiffs primarily performed their work for Defendants within the City and County of Fresno." (ECF No. 94, p. 10). Thus, much of the evidence will likely be found within this District and court proceedings efficiently proceed here. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017) ("This case involves drivers who serviced routes in Northern California, many of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District. Because much of the evidence will be found here, it would be efficient to try the case here."). Finally, there are no apparent difficulties likely to be encountered in managing this class action. Thus, the Court finds that the superiority requirement is met.

## C.    Rule 23(e) Requirements

If a proposed settlement agreement "would bind class members," the Court must find that it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>     (i) the costs, risks, and delay of trial and appeal;
>     (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>     (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>     (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

> In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the *Churchill* factors). "In addition, the settlement may not be the product of collusion among the negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule 23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's fees' when determining whether 'the relief provided for the class is adequate[,]' . . . courts must balance the 'proposed award of attorney's fees" vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors and then turn to collusion, the *Bluetooth* factors, and other considerations.

### 1.     The strength of Plaintiff's case

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

In support of the parties' proposed settlement, Plaintiffs assert that various risks and defenses warrant reductions in the maximum value of the claims.

### a.    BBSI liability

MM 879, who employed Plaintiffs as cleaning employees, contracted with BBSI for certain administrative tasks, like payroll processing services. (ECF No. 253-2, p. 2). And as noted above, the assigned District Judge initially granted summary judgment to BBSI, concluding that it was not a joint employer of Plaintiffs, but the Ninth Circuit reversed that decision because "Plaintiffs . . . presented evidence that BBSI retained the right to terminate MM 879 employees with or without cause, even if it did not exercise that right," and in the "Employee Handbook for MM 879 employees, BBSI is unambiguously characterized as a joint employer" although "[s]uch characterization, standing alone, is not necessarily enough to create an employment relationship." (ECF No. 205, pp. 5, 6).

With this background in mind, Plaintiffs assert that "the most significant risk factor was Plaintiffs' ability to establish at trial that BBSI was a joint employer of Plaintiffs and the Class Members, and should thus be held jointly and severally liable for the alleged wage and hour violations." (ECF No. 253-1, p. 21). Regarding the legal viability of this issue, Plaintiffs' counsel has provided a declaration stating as follows:

> Plaintiffs remain confident in their interpretation of the law and believe that BBSI's right to terminate MM 879's employees renders it a joint employer under California law and renders it liable for the wage and hour violations at issue here. However, Plaintiffs are also cognizant of several possible outcomes in this case. First, BBSI has already been successful in obtaining summary judgment on this issue, and it is possible another motion could likewise be successful on different grounds. Second, it will be Plaintiffs' burden to prove the joint employer relationship at trial, and it is possible a jury could find that BBSI did not practically have the power or ability to terminate MM 879's employees, despite the language of their contractual agreement. Third, even if Plaintiffs succeed in establishing that BBSI was their and the Class Members' joint employer, Plaintiffs will have the additional hurdle of establishing that BBSI should be held jointly and severally liable for the alleged wage and hour violations. As discussed in *Serrano v. Aerotek, Inc.*, 21 Cal. App. 5th 773, 783 (2018), *disapproved on other grounds by Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58 (2021), a joint employer is not automatically liable for the wage and hour violations of other employers simply by virtue of its joint employer relationship. *See id.* Accordingly, it is possible Plaintiffs could prove that BBSI was a joint employer, and a jury could still find that BBSI was not responsible for and is not liable for the alleged wage and hour violation.

(ECF No. 253-2, pp. 11-12).

The significance of BBSI remaining a defendant revolves around MM 879's ability, on its

16

own, to pay any settlement or judgment. Plaintiffs state that, during discovery, it became apparent "that MM 879 alone, a small business operating two Merry Maids franchises in central California, does not have adequate resources to pay a reasonable settlement or judgment in this matter" and "MM 879 has made numerous representations that it would be required to file bankruptcy even if required to pay its own attorneys to defend the case through trial, given the great costs associated with trying a case." (*Id.*).

Having discussed this general risk of proceeding without a settlement, the Court turns to Plaintiffs' substantive claims.

### b.    Failure to Pay Minimum Wages

Plaintiffs' failure-to-pay-minimum-wages claims are mainly based on Labor Code §§ 1197 and 1194(a), which require the payment of a minimum wage and provide employees the right to recover in a civil action if they are not paid accordingly. (ECF No. 94, p. 19). They contend that Defendant MM 879 used a percentage pay model (or what they call a piece-rate compensation) for cleaners, *i.e.*, employees were paid a percentage of the cleaning fee collected from the customer. (ECF No. 253-2, p. 13). However, employees were not paid a minimum wage after factoring in nonproductive time, such as picking up supplies. *See* Cal. Lab. Code § 226.2(a)(4) (requiring employees compensated on a piece-rate basis to "be compensated for other nonproductive time at an hourly rate that is no less than the applicable minimum wage").

As for supporting evidence, Plaintiffs state that, while being deposed, MM 879 Owner and CFO Jeff Skadburg admitted "that employees were not paid an hourly rate for nonproductive time, and to calculate an employee's hourly rate of pay under the 'percentage pay' compensation model, MM 879 merely divided the employee's weekly 'percentage pay' compensation by the number of weekly work hours reported by the employee." (ECF No. 253-2, p. 14).

In valuing these claims, Plaintiffs' expert, Keith Mendes, had to rely on estimates of non-productive time because it was never tracked.[10] For example, driving time may range from 30 minutes to 3 hours depending on the assignment. (*Id.*). "Accordingly, Plaintiffs' initial exposure estimates fell on an average of approximately 90 minutes per day. Based on Mr. Mendes' report,

---

[10] Plaintiffs cite Mendes' expert report in various parts of their motion, which was filed on the record on May 30, 2024. (ECF No. 238). Generally, the report provides the basis for the valuation of their claims, as will be discussed.

1    this resulted in overall exposure of $750,903 for unpaid non-productive time, exclusive of

2    interest." (*Id.* at 15).

3                            **c.    Failure to Provide Meal Periods**

4            Plaintiffs' failure-to-provide-meal-periods claims are mainly based on Labor Code §§ 512

5    and 226.7, which generally require at least a 30-minute meal break for a work period of more than

6    five hours per day and provide a penalty of one additional hour of pay at the employee's regular

7    rate of compensation for each workday that the meal period is not provided. (ECF No. 94, p. 22).

8            As for supporting evidence, Plaintiffs contend that Defendant "MM 879's meal period

9    policy "either omits or misstates several aspects of the employee's entitlement to meal periods

10   under California law," which can be used to establish liability. (ECF No. 253-2, p. 16).

11   Additionally, for a certain time period, Defendant MM 879 did not maintain records for employee

12   meal periods; rather, employees used handwritten timecards, which Plaintiffs assert triggers a

13   rebuttable presumption of meal-period violations. (*Id.* at 17). Owner and CFO Jeff Skadburg

14   "conceded in deposition testimony that MM 879 has no way of knowing whether employees

15   actually took meal periods during the period of time in which handwritten timecards were used."

     (*Id.*).

16           Moreover, "despite not knowing whether any employee actually received a meal period,

17   MM 879 had a class-wide practice of automatically deducting one hour of pay from its

18   employees' hours, resulting in additional off-the-clock work and unpaid minimum and overtime

19   wages." (*Id.* at 17-18). Lastly, after MM 879 transitioned to an electronic timekeeping system,

20   "despite being specifically required to record a one-hour meal period each day, MM 879's

21   employees were required to drive between cleaning assignments while eating their lunch, and

22   therefore were not relieved of duty during meal periods." (*Id.* at 18). At their depositions,

23   "Plaintiffs unanimously testified that they did not receive a reasonable opportunity to take an off-

24   duty meal period, and were in fact instructed by MM 879 management to continue working

25   during their lunch." (*Id.*).

26           Regarding risks, Plaintiffs state that, even though there was a deficient policy, liability

27   would likely be limited to instances where time records would corroborate a non-compliant meal

28   period. (*Id.*). And providing proof of meal-period violations would be difficult because there are

                                              18

records showing a meal period was taken (although Plaintiffs contend these records are incorrect), thus necessitating class members to provide testimony as to whether they took meal periods on workdays where meal periods were recorded. (*Id.* at 19). And providing such testimony would be "further complicated by the difficulty in maintaining long-term contact with Class Member witnesses during the many years this case has been pending." (*Id.*). "Accordingly, Plaintiffs perceived a risk of decertification as to the issue of whether the Class Members were required to work through meal periods on days where a meal period was actually recorded." (*Id.*).

In valuing these claims, Plaintiffs' expert determined that "Defendants faced up to $139,756 in exposure for failure to provide meal periods, exclusive of interest." (ECF No. 253-2, p. 19).

### d.    Failure to Provide Rest Periods

Plaintiffs' failure-to-provide-rest-periods claims are mainly based on Cal. Code Regs. tit. 8, § 11040, subd. (12) and Labor Code § 226.7, which generally require a 10-minute rest break per 4 hours of work and provide a penalty of one additional hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided. (ECF No. 94, p. 24). Additionally, Labor Code § 226.2(a) requires that, for employees compensated on a piece-rate basis, they are still must be "compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation."

As for supporting evidence, Plaintiffs contend that there is evidence indicating that Defendant "MM 879 did not provide separate compensation for rest periods, in violation of California's requirement that rest periods be paid." (ECF No. 253-2, p. 20). "Thus, even assuming for the sake of argument that the Class Members were relieved of duty for minimum 10-minute rest breaks, it is undisputed that any such breaks were unpaid . . . ." (*Id.*).

In valuing these claims, Plaintiffs' expert "assumed that for any shift over 3.5 hours, any rest periods taken by the Class Members were unpaid during the time that the percentage pay compensation model was in effect" and "then applied a premium based on the Class Members' regular rate of pay for each workday over 3.5 hours during that same timeframe." (*Id.*). This resulted in an "overall exposure for failure to provide rest periods . . . calculated to be $421,444, exclusive of interest."

e.      **Failure to Provide Accurate and Itemized Wage Statements**

Plaintiffs' failure-to-provide-accurate-and-itemized-wage-statement claims derive from their other claims, *e.g.*, then contend that because they were not properly compensated for meal and rest periods, their wage statements were inaccurate. (ECF No. 253-2, p. 20). These claims are based on Labor Code § 226, which generally requires an employer to provide employees with accurate itemized wage statements showing a variety of information (including gross wages earned and total hours worked) and penalizes knowing and intentional failures to do so by permitting recovery of $50 for the initial pay period in which a violation occurs and $100 per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of $4,000. (ECF No. 94, pp. 25-26).

Regarding risks, Plaintiffs state that, "because [Plaintiffs'] wage statement claim is entirely derivative on the underlying alleged failures to pay minimum and overtime wages and to provide meal and rest periods, the same reductions and adjustments applied above are warranted on this claim, for the same reasons articulated above." (ECF No. 253-2, pp. 22). Additionally, they note that, under California law, there is the risk that Defendants could assert a good faith defense that their meal-and-rest-period policies were legally compliant:

> Therefore, Defendants' potential exposure will significantly decrease, because their ability to present a good-faith defense with respect to the meal/rest period aspect of Plaintiffs' wage statement claim presents additional risks to Plaintiffs' ability to establish their claim on a class-wide basis, and the assertion of a good-faith defense may also generate individualized inquiries rendering class treatment of this theory of liability unmanageable. Indeed, a large portion of Defendants' liability for wage statement violations is driven by their underlying exposure for failure to provide meal periods. Accordingly, there is a substantial risk that Defendants will be able to mount a credible good-faith defense, because it may not have intended nor even had knowledge of any failure to pay meal period premium wages.

(*Id.*).

In valuing these claims, Plaintiffs' expert determined that "Defendants' exposure for failure to provide wage statements is calculated to be up to $171,376." (*Id.* at 21). For this valuation, they used only the initial violation penalty rate—*i.e.*, $50—because Plaintiffs are not aware of past cases where MM 879 has been notified by the Labor Commissioner or a court that its wage statements violated the law, citing caselaw indicating that lack of notice of Labor Code

20

provisions may provide a good faith defense to heightened penalties. (*Id.* at 22). Based on the risks for these claims, Plaintiffs estimate a risk-adjusted value of $100,000. (*Id.*).

### f.        Failure to Pay All Wages Due and Owing Upon Termination

Plaintiffs' failure-to-pay-all-wages-due-and-owing-upon-termination-of-employment claims likewise derive from their other claims, *e.g.*, then contend they were still owed unpaid minimum and overtime wages when they separated from employment. (ECF No. 253-2, p. 23). These claims are based on Labor Code §§ 201 and 202, which general require employers to pay all wages due when an employee leaves employment within certain timeframes depending on the circumstances. Section 203 penalizes failure to comply with §§ 201 and 202 by providing that an employee's wages will continue as a penalty from the due date at the same rate until paid, or an action is commenced, but not for more than 30 days.

Regarding risks, Plaintiffs rely on the same risks offered for their failure-to-provide-accurate-and-itemized-wage-statements claims, *i.e.*, they may not succeed on the underlying claims and Defendants may be able to present good-faith defenses. (*Id.* at 23-24).

In valuing these claims, Plaintiffs' expert determined that "Defendants' liability for waiting time penalties is calculated to be up to $286,499." (*Id.* at 23). Based on the specific risks for these claims, Plaintiffs estimate a risk-adjusted value of $140,000.

### g.        PAGA claims

"Although the court does not evaluate the settlement of PAGA claims under the Rule 23 criteria, it must still inquire into the fairness of the PAGA settlement." *Wells v. DCI Donor Servs., Inc.*, No. 2:21-CV-00994-CKD, 2024 WL 4436905, at *11 (E.D. Cal. Oct. 7, 2024). Courts apply standards like Rule 23 in making this assessment, asking if the PAGA settlement is fair, adequate, and reasonable. *See, e.g.*, *Mondrian v. Trius Trucking, Inc.*, No. 1:19-CV-00884-DAD-SKO, 2022 WL 2306963, at *7 (E.D. Cal. June 27, 2022) (applying Rule-23 like standard to PAGA claims). Plaintiff estimates the maximum potential value of these claims at $1 million (without stacking penalties) and $2.5 million (with stacking). (ECF No. 253-2, p. 24).

Regarding risks, Plaintiffs rely on the same risks offered for their claims discussed above, assert that California courts have largely rejected arguments to stack PAGA penalties, and contend that PAGA penalties could be reduced based on the Court's discretion. (*Id.* at 24-26).

Based on these risks, "Plaintiff estimates the realistic exposure under PAGA," or what the Court will consider to be the assigned risk-adjusted value, "to be in the range of $100,000." (*Id.* at 26).

### h.    Conclusion

The following table summarizes the valuation of the claims discussed above.

| CLAIMS | MAXIMUM POTENTIAL VALUE | Risk-Adjusted Amount | Percentage Risk-Adjusted Discount of Claim |
|---|---|---|---|
| **Failure to Pay Wages** | $750,903 | $750,903 | 0% |
| **Failure to Provide Meal Periods** | $139,756 | $139,756 | 0% |
| **Failure to Provide Rest Periods** | $421,444 | $421,444 | 0% |
| **Wage Statement Penalties** | $171,376 | $100,000 | 42% |
| **Waiting Time Penalties** | $286,499 | $140,000 | 51% |
| **PAGA** | $2,500,000 | $100,000 | 96% |
| **TOTALS** | **$4,269,978** | **$1,652,103** | 61% |

The Court concludes that Plaintiffs have adequately explained how they calculated their claims.

### 2.    The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and

expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May 19, 2017).

Plaintiffs argue that, without settlement, the parties would need to engage in further litigation, including issues regarding certification or desertification, and perhaps a lengthy and complex trial. (ECF No. 253-1, p. 24).

Based on the record evidence, including the discovery so far taken and strengths and weakness of the case, the Court concludes that this consideration weighs in favor of approving the parties' proposed settlement.

### 3.    The amount offered in settlement

The amount offered in settlement "is generally considered the most important" factor of any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15, 2015). In determining whether the amount offered in settlement is fair and reasonable, a court compares the proposed settlement amount to the maximum potential amount recoverable through successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *Id.* (citation omitted). For complex class action cases, Ninth Circuit has "a strong judicial policy that favors settlements. Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation marks and citation omitted).

### a.    Percentage recovery

If Plaintiff were to prevail on all claims, the estimated potential maximum recovery would be $4,269,978 ($1,769,978 potential maximum for the class claims + $2.5 million potential maximum for the PAGA claims). Of the $2.5 million in potential maximum PAGA penalties the LWDA would receive 75% ($1,875,000) and the remaining 25% ($625,000) would go to the aggrieved employees. *See* Cal. Labor Code § 2699(i). Deducting LDWA's proportion ($1,875,000) of the PAGA penalty from the projected maximum ($4,269,978) leaves $2,394,978 going to the class members and aggrieved employees. *See Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting

LWDA's portion of estimated PAGA penalty from the projected recovery amount before calculating the percentage rate of recovery). The gross settlement amount ($995,000) is approximately 42% of $2,394,978.

Turning to the net settlement valuation (not the gross settlement amount), and considering the class claims in isolation, the net settlement for the class claims ($350,383.34) is approximately 20% of the recovery of the potential maximum value of the class claims ($1,769,978). Considering the PAGA claims in isolation, the total amount allocated for PAGA penalties ($75,000) is 3% of the potential maximum value of the PAGA claims ($2,500,000).

The below table illustrates these rates of recovery.

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY |
| --- | --- | --- |
| All Claims | $2,394,978 (this figure does not count the amount of PAGA penalties that would go to the LWDA) | 42% (Based on GSA of $995,000) |
| Class Claims | $1,769,978 | 20% (Based on net settlement amount of $350,383.34) |
| PAGA Claims | $2,500,000 | 3% (Based on total PAGA penalties of $75,000) |

Ultimately, the Court finds this recovery reasonable and above other percentages that courts have approved. *Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2022 WL 2817435, at *12 (E.D. Cal. July 19, 2022) ("In fact, 10% of the verdict value of non-PAGA claims is generally considered the low end of reasonable recovery.") (internal quotation marks and citation omitted); *see Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) ("Thus, Plaintiffs argue that a settlement for fourteen percent recovery of Plaintiffs' maximum recovery is reasonable under the circumstances. The Court agrees.") (internal citation

to record omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery. The Court is satisfied that these numbers are fair.").

In reaching this determination, the Court reiterates that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

### b.    Allocation of settlement shares

The Court also considers whether the allocation of the settlement is fair, reasonable and adequate, with it being "reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008).

Plaintiff describes the allocation of the settlement shares as follows:

> Each of the Settlement Class Members will be eligible to receive his or her individual share of the Net Class Settlement Fund based on the total number of weeks worked by each Settlement Class Member during the Class Period. (*Id.* at ¶ III.17.) The benefit of this formula is that it relies upon objective evidence of the term of employment, which Class Members can easily review and confirm for themselves. There are differences in how the Individual Settlement Amounts will be calculated because of the distinctions between Rule 23 of the Federal Rules of Civil Procedure, which applies to the California Class, and California Labor Code section 2698 *et seq.*, which applies to Plaintiffs' claims under PAGA. Only those Settlement Class Members who worked during the period applicable to Plaintiff's PAGA claims will also receive an Individual PAGA Payment, which will be calculated based on the total number of pay periods worked by each PAGA Group Member during the PAGA Period. (*Id.* at ¶ III.16.)

> The Settlement Administrator will calculate each Class Member's Individual Settlement Payment by (a) dividing the Net Class Settlement Fund by the total number of weeks worked by all Settlement Class Members during the Class Period and (b) multiplying the result by each Class Member's Workweeks. (*Id.* at ¶ III.17.) The Individual PAGA Payments shall be calculated by (a) dividing the amount of the Aggrieved Employees' 25% share of PAGA Penalties ($18,750) by the total number of Pay Periods of all Aggrieved Employees during the PAGA Period and (b) multiplying the result by each Aggrieved Employee's PAGA Pay Periods. (*Id.* at ¶ III.16.)

(ECF No. 253-1, p. 14).

The Court finds this allocation acceptable. Notably, the essence of Plaintiffs' claims is that

the class members were paid a piece rate and were not properly paid wages, meal and rest periods, and suffered derivative wage statement and waiting penalties. Accordingly, the allocation of settlement payments based on how much they worked would be fair to the class members and aggrieved employees.

### 4. The extent of discovery completed and the stage of proceedings; experience and views of counsel

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527–28 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." (citations omitted)).

As noted in the background discussion above, the settlement follows nearly 14 years of litigation in both State and Federal Court, including extensive discovery, dispositive motion practice, and Federal appellate proceedings before the parties reached a settlement following mediation and subsequent negotiations.

Here, Plaintiffs' attorneys have provided declarations, generally summarizing their experience with class action litigation and stating that the settlement is fair and reasonable and in the best interests of the those concerned. (ECF No. 253-2, p. 31; ECF No. 253-3, pp. 2-7).

Accordingly, this factor weighs in favor of approval.

### 5. The presence of a government participant

Although there is no governmental party to this lawsuit, the LWDA may express its views. Under California Labor Code § 2699(*l*)(2), a "proposed settlement shall be submitted to the [LDWA] at the same time that it is submitted to the court" for the LWDA's review and approval.

Plaintiffs' counsel has filed a declaration, stating as follows: "At the time of filing this Motion, our office has submitted a copy of the Agreement to the LWDA in accordance with Labor Code section 2699(l)(2). Attached hereto as 'Exhibit 2' is a true and correct copy of an email my office received from the LWDA confirming our office's submission of the Agreement on April 24, 2025." (ECF No. 253-2, p. 31). Additionally, counsel attaches an email that appears

to confirm such submission on April 24, 2025. (*Id.* at 87).

Further, as Plaintiffs note, this case was removed under the Class Action Fairness Act (CAFA). (ECF No. 253-1, p. 9, *see* ECF No. 1, p. 2). Under 28 U.S.C. § 1715(b), CAFA requires notice of a proposed class action settlement, and certain documents, to be served by each participating defendant on appropriate state and federal officials not later than 10 days after the filing of a proposed settlement.[11] *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1075 (9th Cir. 2017) (noting this requirement). The Ninth Circuit has described this requirement as follows:

> Complementing the expansion of federal jurisdiction to ensure uniformity and fairness is CAFA's class action settlement notice requirement, 28 U.S.C. § 1715, which was intended to "provide a check against inequitable settlements." S.Rep. No. 109–14, at 35 (2005), 2005 WL 627977, at *34; *see In re Uponor, Inc.*, F1807 Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1064–65 (8th Cir.2013). Section 1715 requires notice of a proposed settlement to be served on the "appropriate" federal and state officials—typically the Attorney General of the United States and "the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant." 28 U.S.C. § 1715(a). In addition, § 1715 prohibits a court from ordering final approval of a proposed settlement until 90 days after the appropriate government officials were notified. *Id.* § 1715(d). The statute is equally clear that it shall not "be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials." *Id.* § 1715(f). These requirements are intended to give states a role in ensuring that citizens are equitably compensated in class action settlements, but states are free not to participate, leaving that task to the courts, which ultimately retain discretion to approve or disapprove any settlement, regardless of a state's intervention.

*California v. IntelliGender, LLC*, 771 F.3d 1169, 1172-73 (9th Cir. 2014).

Attached to Plaintiffs' supplement is a declaration for Attorney Laruen Roseman, counsel for BBSI, stating that "on June 6, 2025, Defendant sent Notice of Settlement to the U.S. Department of Justice and the California State Attorney's Office pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 on behalf of Defendants BBSI and MM 879, Inc." (ECF No. 256-1, p. 2).

Here, no governmental entity has yet raised any objection to the settlement. Accordingly, this factor weighs in favor of approval.

---

[11] Section 1715(b) provides in part as follows: "Not later than 10 days after a proposed settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of [various documents and information, including the complaint]."

### 6.    The reaction of the class members to the proposed settlement

At this stage, the reaction of the class members to the proposed settlement is unknown, so this factor cannot be addressed.

### 7.    Collusion

"The potential for collusion reaches its apex pre-class certification because, among other things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseño*, 998 F.3d at 1024.

The Court now turns to the *Bluetooth* factors, which are indications courts evaluate to determine whether class counsel have allowed their own interests to infect settlement negotiations—(1) whether counsel receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998 F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir. 1999). Where, as here, fees are to be paid from a common fund, the relationship between the class members and class counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result, the Court must assume a fiduciary role for the class members in evaluating a request for an award of attorneys' fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009).

The Ninth Circuit has approved two methods for determining attorneys' fees in cases where the award is taken from the common fund set aside for the entire settlement: the "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822 SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach, "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it

yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

Under the percentage of the fund method, the Court may award class counsel a given percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a twenty-five percent award, is the "benchmark" amount of attorneys' fees, but courts may adjust this figure if the record shows special circumstances justifying a departure. *Six (6) Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). The Ninth Circuit has permitted courts to award attorneys' fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the circumstances of the case and reach a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3) counsel's performance; and (4) the amount sought to be awarded compared to the market rate. *Id.* at 1048-49.

Here, Plaintiffs' counsel has requested fees not to exceed $331,666.66 (or approximately 33%) of the gross settlement. (ECF No. 253-2, p. 28). Plaintiffs' counsel will support the request in a motion to be filed in the future, with counsel proposing that it be heard at the final approval hearing. (*Id.*). Additionally, the settlement agreement caps costs at $130,000, with support for this amount to be included with the fee motion. (*Id.*).

Plaintiffs generally indicate that the fee award is warranted based on significant risks in litigating this case, their incurrence of costs prior to recovery, and the fact that this case has been pending approximately 14 years with extensive litigation. Without developed argument or evidence, the Court cannot determine whether the 33% request is warranted, nor whether the fees were reasonably incurred. However, the Court will preliminarily approve the settlement based on the information presented thus far and will determine the reasonableness of the fees and costs after reviewing Plaintiffs' to-be-filed motion.

Next, the proposed settlement contains a clear sailing provision, *i.e.*, a provision that Defendants will not object to a certain fee request. Notably, it states that Defendants will not oppose a fee award that does not exceed 1/3 of the settlement and will not oppose costs that do not exceed $130,000. (ECF No. 253-1, pp. 52-53). However, there is no "reverter" clause, *i.e.*, a

1    provision that fees not awarded revert to Defendant rather than the class fund. Rather, the

2    settlement agreement expressly states that "no portion of the Gross Settlement Amount shall

3    revert to Defendants." (*Id.* at 38).

4            The Court concludes that this factor weighs in favor of approval.

5                    **8.    Class representative service payment**

6            A court may award incentive payments to named plaintiffs in class action cases.

7    *Rodriguez*, 563 F.3d at 958-59. The purpose of incentive awards is to "compensate class

8    representatives for work done on behalf of the class, to make up for financial or reputational risk

9    undertaking in bringing the action, and, sometimes, to recognize their willingness to act as a

10   private attorney general."  *Id.* To justify notable disparities between a class representative award

11   and what other class members receive, a Plaintiff must present "evidence demonstrating the

12   quality of plaintiff's representative service," such as "substantial efforts taken as class

13   representative to justify the discrepancy between [his] award and those of the unnamed

     plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

14           The Ninth Circuit has emphasized, however, that "district courts must be vigilant in

15   scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc*., 715 F.3d 1157, 1165

16   (9th Cir. 2013) (internal quotation marks and citation omitted). In keeping with that admonition,

17   courts have declined to approve incentive awards that represent an unreasonably high proportion

18   of the overall settlement amount or are disproportionate to the recovery of other class members.

19   *See Ontiveros*, 303 F.R.D. at 365-66 (finding an incentive award of $20,000, comprising 1% of

20   the common fund, to be excessive under the circumstances, and reducing the award to $15,000,

21   where class representative spent 271 hours on the litigation and relinquished the opportunity to

22   bring several of his own claims in order to act as class representative)*; see also Ko v. Natura Pet

23   Prods., Inc.*, Civ. No. 09–2619 SBA, 2012 WL 3945541, at *15 (N.D. Cal. Sept. 10, 2012)

24   (holding that an incentive award of $20,000, comprising one percent of the approximately $2

25   million common fund was "excessive under the circumstances" and reducing the award to

26   $5,000). In reducing an award, courts have noted that overcompensation of class representatives

27   could encourage collusion by causing a divergence between the interests of the named plaintiff

28   and the absent class members, destroying the adequacy of class representatives. *See Staton*, 327

F.3d at 977-78; *see also Radcliffe*, 715 F.3d at 1165.

Here, the settlement agreement provides for a total class representative payment of $100,000, consisting of $25,000 for each of the named Plaintiffs. (ECF No. 253-2, p. 52). However, neither the motion, nor declarations of defense counsel or Plaintiffs provide specific support for this especially high incentive award. For example, the motion generally states: "In this case, Plaintiffs have been instrumental in prosecuting this Action from the outset, through more than 14 long years of intense litigation including extensive discovery, certification of a class, and multiple offensive and defensive motions for summary judgment. Plaintiffs were an important source of information during the course of this litigation and aided in the investigation into the policies and practices of Defendants." (ECF No. 253-1, p. 24).

The proposed payment represents about 10% of the gross settlement amount ($100,000 / $995,000). This amount is about 100 times the average $962.59 estimated to go to the average class member. And the Court notes that the requested award is higher than the $5,000 incentive award that has been recognized as "presumptively reasonable" by some courts. *Austin v. Foodliner, Inc.*, No. 16-CV-07185-HSG, 2019 WL 2077851, at *8 (N.D. Cal. May 10, 2019).

The Court cannot fully evaluate the incentive reward request based on the information provided. However, it will preliminarily approve the settlement and address the request further after considering to-be-filed briefing on this issue.

**9.    Approval of a settlement administrator**

The parties agree to use third-party settlement administrator ILYM Group, Inc., with a $7,950 cap in costs. (ECF No. 253-1, p. 26). According to Plaintiff's counsel, ILYM Group, Inc. has experience in the administration of class action settlements. The Court finds ILYM Group is an appropriate settlement administrator should the settlement be eventually approved.

**10.    Notice procedures**

For proposed settlements under Rule 23, "the court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B); *see also Hanlon*, 150 F.3d at 1025 ("Adequate notice is critical to court approval of a class settlement under Rule 23(e)."). A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to

investigate and to come forward and be heard." *Churchill Vill., LLC*, 361 F.3d at 575 (internal

quotations and citations omitted). The absent class members must be provided with notice, an

opportunity to be heard, and a right to opt-out of the class. *AT&T Mobility LLC v. Concepcion*,

563 U.S. 333, 349 (2011). "The notice must clearly and concisely state in plain, easily understood

language" the following information:

> the nature of the action; (ii) the definition of the class certified; (iii) the class
> claims, issues, or defenses; (iv) that a class member may enter an appearance
> through an attorney if the member so desires; (v) that the court will exclude from
> the class any member who requests exclusion; (vi) the time and manner for
> requesting exclusion; and (vii) the binding effect of a class judgment on members
> under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

The contents of the notice that Plaintiffs propose includes the following:

> (1) the material terms of the settlement and a brief explanation of the case; (2) the
> proposed attorneys' fees, litigation expenses, and the costs of administration; (3) a
> statement that the court will exclude the Class Member from the class if the
> member so requests by a specified date; (4) a procedure for the Class Member to
> follow in requesting exclusion from the class; (5) a statement that the judgment
> will bind all Class Members who do not request exclusion; and (6) a statement that
> any Class Member who does not request exclusion may, if the Class Member so
> desires, enter an appearance through counsel; and (7) how Class Members can
> obtain additional information. In addition, the Notice will inform Class Members
> of their estimated settlement shares.

(ECF No. 253-1, p. 27).

The Court notes that the District Judge previously approved a similar class notice plan on

March 24, 2023. (ECF No. 217). And the Court finds the proposed notice acceptable.

## IV.    CONCLUSION AND ORDER

Based on the forgoing, IT IS ORDERED as follows:

1.    The Court preliminarily approves the terms of the settlement discussed above and

Plaintiffs' motion for class certification and preliminary approval (ECF Nos. 253, 256) is

granted.

2.    The following settlement class is conditionally certified: All non-exempt employees of

MM 879, Inc., who performed work in California from April 6, 2007, through January 18,

2019.

3.    Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz, and Christie Goodman are

conditionally approved as the class representatives for the settlement class.

4. S. Brett Sutton and Brady Briggs of Sutton Hague Law Corporation, P.C. are conditionally approved as class counsel for the settlement class.

5. The Court conditionally approves ILYM Group, Inc. as the settlement administrator and payment of $7,950 to it as costs.

6. The Court approves, and authorizes the issuance of, the notice (as submitted to the Court) and the parties shall implement the notice schedule set forth in the settlement agreement

7. A final approval hearing is scheduled for October 17, 2025, at 10 a.m. before Magistrate Judge Erica P. Grosjean, in Courtroom 10 on the 6th Floor of the Robert E. Coyle United States Courthouse. Alternatively, the parties and their counsel may participate telephonically. To connect to the conference via telephone, the parties shall (1) dial 1-669-254-5252, (2) enter 161 733 0675 for the meeting ID followed by #, (3) enter # when asked for the participant ID, (4) enter 740484 for the meeting passcode followed by #, and (5) enter *6 to unmute.

8. A combined motion for final approval of the settlement, the class incentive award, and an award of attorney fees and costs shall be filed by no later than September 17, 2025.

9. The settlement administrative shall file a report regarding the outcome of the notice process by no later than September 17, 2025.

IT IS SO ORDERED.

Dated:   **June 16, 2025**                    /s/ _Erica P. Grosjean_

UNITED STATES MAGISTRATE JUDGE