1

2

3

4

5

6

7                          UNITED STATES DISTRICT COURT

8                          EASTERN DISTRICT OF CALIFORNIA

9

10    ANGELA CRUZ, *et al.*,                    Case No.  1:15-cv-01563-TLN-EPG

11                      Plaintiffs,             ORDER GRANTING, IN PART,
                                                PLAINTIFFS' MOTION FOR FINAL
12            v.                                APPROVAL OF CLASS CERTIFICATION
                                                AND APPROVAL OF A CLASS ACTION
13    MM 879, INC., *et al.*,                   SETTLEMENT

14                      Defendants.             (ECF Nos. 258, 260)

15

16           The parties have reached a settlement in this putative class action case that primarily

17    alleges California state labor law violations. Now before the Court is Plaintiffs' unopposed

18    motion to certify the settlement class and issue a final approval of the parties' settlement. (ECF

19    No. 258). The parties have agreed to the undersigned "conducting all proceedings related to the

20    approval and administration of the Parties' [settlement], including entry of final judgment, with

21    direct review by the Ninth Circuit Court of Appeals, in the event an appeal is filed." (ECF No.

22    252).

23           On October 17, 2025, the Court held a hearing on the motion. (ECF No. 259). Thereafter,

24    the Court ordered Plaintiffs to file a supplement addressing certain issues, which Plaintiffs have

25    done. (ECF No. 260).

26           Upon consideration of Plaintiffs' motion, supplement, and the record, the Court will grant

27    the motion, in part. (ECF No. 258). As explained below, the Court will reduce the service award

28    from Plaintiffs' requested $25,000 to $10,000 (per each named Plaintiff) for a total award of

1 $40,000 (rather than the $100,000 requested) but otherwise grant the motion.

2 **I.    BACKGROUND**

3     **A.    Procedural History**

4 Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz, and Christine Goodman generally
5 allege that they have suffered California Labor Code violations in connection with their
6 employment as cleaners. (ECF No. 94). They filed this case in the Fresno County Superior Court
7 on April 6, 2011.[1] (ECF No. 3-2, p. 2). This case was heavily litigated in state court for
8 approximately four-and-a-half years before certain Defendants removed it to this Court on
9 October 14, 2015. (ECF No. 258-3, pp. 4-5). Among other things, the state court litigation
10 involved (1) extensive discovery necessitating the appointment of a special master, (2) dispositive
11 motion practice, including summary judgement motions concerning whether certain Defendants
12 employed Plaintiffs, and (3) the filing of petition for writ of mandate to the Fifth District Court of
Appeal. (*Id.*).

13 Following removal, Plaintiffs filed their operative fifth amended complaint against the
14 following Defendants: (1) MM 879; (2) Barrett Business Services, Inc. (BBSI); (3) The
15 Servicemaster Company LLC; (4) Merry Maids LP; and (5) MM Maids LLC. (ECF No. 94, p. 1).
16 The latter three Defendants, collectively referred to as the Merry Maids Defendants, were
17 ultimately dismissed from this case, as further explained below.

18 Plaintiffs alleged that the Defendants named in their operative complaint jointly employed
19 them. (*Id.* at 4). Plaintiffs brought Causes of Action 1-6, 8, and 9 on behalf of themselves and
20 putative class members:

21    (1) Failure To Pay Minimum Wages In Violation Of Labor Code §§ 1197, 1194 &
1194.2;
22    (2) Failure To Pay Overtime In Violation Of Labor Code § 510;
23    (3) Failure To Provide All Mandated Meal Periods Or Additional Wages In Lieu
Thereof;
24    (4) Failure To Provide All Mandated Rest Periods Or Additional Wages In Lieu
25    Thereof;
26    (5) Failure To Issue Accurate Wage Statements In Violation Of Labor Code § 226;

27
28 [1] Plaintiff Christie Goodman was later added as a plaintiff in the third amended complaint. (ECF No. 253-1, p. 8 n.1).

2

(6) Failure To Timely Pay Wages Due At Termination In Violation Of Labor Code §§ 201, 202 & 203;

(8) Unfair Competition (Bus. & Prof. Code § 17200);

(9) Declaratory Relief

(*Id.* at 1-2, 6).[2]

Plaintiff also brought Causes of Action 10-18 under California's Private Attorneys General Act (PAGA), Cal. Lab. Code § 2698-2699.5, "which allows aggrieved employees to recover civil penalties for Labor Code violations on behalf of themselves, the state, or other current or former employees." *Callahan v. Brookdale Senior Living Communities, Inc.*, 42 F.4th 1013, 1017 (9th Cir. 2022). (ECF No. 94, p. 2).

As in state court, this case has been heavily litigated here. Among other things, following substantial briefing from the parties, the assigned District Judge granted Plaintiffs' motion for class certification on January 18, 2019. (ECF No. 161, p. 14). The same day, the District Judge denied the Merry Maids Defendants' motion for summary judgment regarding whether they employed Plaintiffs. (ECF No. 162). While the District Judge concluded that the Merry Maids Defendants were entitled to summary judgment under a joint-employer theory of liability, there existed a triable issue of fact as to whether they could be liable based on an ostensible-agency theory. (*Id.* at 14, 16).

Thereafter, the Merry Maids Defendants moved for reconsideration, which motion the District Judge granted, along with their prior motion for summary judgment, based on recent authority from the Ninth Circuit concluding that a franchisor could not be held liable for wage-and-hour violations under an ostensible-agency theory. (ECF No. 182, p. 7, citing *Salazar v. McDonald's Corp.*, 944 F.3d 1024 (9th Cir. 2019)).

Defendant BBSI, which provided certain services to Defendant MM 879's employees (*i.e.*, payroll processing, human resource consulting, workers' compensation insurance coverage) moved for summary judgment on October 9, 2019, arguing that it did not employ Plaintiffs. (ECF No. 175). The District Judge granted that motion on November 30, 2020. (ECF No. 192).

Plaintiffs appealed the dismissal of the Merry Maids Defendants and BBSI from the case.

---

[2] Cause of Action 7—failure to provide expense reimbursements—was later dismissed by the assigned District Judge. (ECF No. 161, p. 14).

(ECF No. 202). On June 2, 2022, the Ninth Circuit affirmed the District Judge's grant of summary judgment as to the Merry Maids Defendants but reversed as to the grant of summary judgment to BBSI. (ECF No. 205, p. 3). Regarding BBSI, the Ninth Circuit held that "the district court . . . erred in concluding as a matter of law that BBSI did not establish a common law employment relationship with Plaintiffs" based, in part, on "evidence that BBSI retained the right to terminate MM 879 employees with or without cause, even if it did not exercise that right." (*Id.* at 4, 5).

Following remand by the Ninth Circuit, the only remaining Defendants in this case are MM 879 and BBSI. The District Judge issued a scheduling order in August 2022 and approved a class notice plan in March 2023. (ECF Nos. 209, 217). On February 13, 2024, Plaintiffs filed a motion for summary adjudication seeking to establish that BBSI was a joint employer of Plaintiffs and MM 879 and BBSI are liable for various wage and hour violations. (ECF No. 228). However, the District Judge held that motion in abeyance while the parties attempted to settle the case. (ECF No. 246).

Ultimately, the parties reached a settlement, and the District Judge deemed the motion for summary adjudication moot. (ECF No. 249). The parties stipulated to a limited consent of the undersigned handling proceedings regarding the approval and administration of their settlement. (ECF No. 252). On April 24, 2025, Plaintiffs filed their motion for preliminary approval, which included a request for class certification. (ECF No. 253). The Court granted that motion on June 16, 2025, setting a final approval hearing and a deadline for Plaintiffs to file their motion for final approval. (ECF No. 257).

Plaintiffs filed their final approval motion on September 16, 2025, which is supported by the declarations of their attorneys, the named Plaintiffs, and an employee of the settlement administrator. (ECF No. 258). The Court held a final approval hearing on October 17, 2025. (ECF No. 259). Counsel for both parties were present but no putative class members appeared at the hearing. Further none of the putative class members objected to the proposed settlement before the hearing or otherwise filed anything with the Court.

Following the hearing, the Court directed Plaintiffs' counsel to file a supplement on the following issues: "(1) itemization or some other proof of the costs incurred by Plaintiffs' counsel;

1    (2) the hourly earnings rate of the named Plaintiffs; (3) Plaintiffs' proposed version of the final

2    approval order." (ECF No. 259). Plaintiffs timely filed their supplement on October 22, 2025.

3    (ECF No. 260). Accordingly, the matter is now ripe for decision.

**B.    Overview of the Settlement Agreement**

**1.    Proposed settlement class and class period; aggrieved employees and PAGA period**

6    The settlement class consists of 350 class members and "includes all non-exempt

7    employees of MM 879, Inc., who performed work in California from April 6, 2007, through

8    January 18, 2019."[3] (ECF No. 258-1, p. 11; ECF No. 258-8, p. 3).

9    The number of aggrieved employees is 270,[4] which include "all non-exempt employees of

10   MM 879, Inc., who performed work in California from May 9, 2010, through January 18, 2019."

11   (ECF No. 258-3, p. 24).

**2.    Terms of the settlement agreement**

13   The gross settlement amount (or GSA) is $995,000. Plaintiffs' motion proposes that the

gross settlement amount be allocated as follows:

|  | Settlement Allocation |
|---|---|
| GSA | $995,000 |
| Attorneys' Fees (1/3 of settlement)[5] | $331,666.66 |
| Litigation Costs | $123,856.68[6] |
| Administrator Costs | $7,950 |
| PAGA Penalties | $75,000 total (75% (or $56,250) of total to LWDA[7] and |

[3] The Court has made minor alterations to some of the quotations in this order, such as changing capitalization and omitting internal citations, without indicating each change.
[4] Attorney Briggs' declaration identifies the number of aggrieved employees as 137. (ECF No. 258-3, p. 24). However, at the hearing, the Court pointed out that this number is inconsistent with the 270 number identified in the declaration of the settlement administrator. (See ECF No. 258-8, p. 3). Attorney Briggs stated at the hearing that the 270 number was the correct number of aggrieved employees.
[5] Plaintiffs elsewhere identify the percentage they seek as 30% of the GSA. (ECF No. 258-1, p. 21). This is incorrect. $331,666.66 is one-third of $995,000.
[6] Plaintiffs' final approval motion requested $127,546.76. (ECF No. 258-1, p. 11). However, the supplement states that this number is the wrong total; the actual amount requested is $123,856.68. (ECF No. 260-1, p. 2).
[7] LWDA stands for the California Labor Workforce and Development Agency.

| | 25% (or $18,750) to 270 Aggrieved Employees) |
|---|---|
| Class Representative Award Not to Exceed | $100,000 total ($25,000 for each of the Plaintiffs) |
| **Net Settlement Amount for 350 Class Members** | **$356,526.66[8]** |

(ECF No. 258-1, pp. 10-11).

Settlement shares will be allocated for the class members and aggrieved employees as follows:

> The Settlement Administrator will calculate the Individual Class Settlement Payments for Participating Class Members. Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked in a non-exempt capacity based on the Class data provided by Defendant, divided by (ii) the total number of weeks worked by all Class Members based on the same Class data, which is then multiplied by the Net Settlement Amount. One day worked in a given week will be credited as a week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the number of weeks that he or she worked.
>
> . . . .
>
> The individual share will be calculated by determining the total number of pay periods during which the PAGA Group Members were employed during the PAGA Period (i.e., the sum of all pay periods of worked by all PAGA Group Members) and dividing $18,750 by that total number of pay periods to determine the monetary value assigned to each PAGA pay period. That number will then be multiplied by the individual PAGA Group Member's total number of pay periods worked during the PAGA Period to determine the Individual PAGA Payment.

(ECF No. 258-8, p. 22; *see* ECF No. 258-1, p. 11 - "Each of the Class Members will be eligible to receive his or her individual share of the Settlement based on the total number of workweeks worked by each Class Member during the Class Period.")

As will be further explained below, because the Court will reduce the total incentive award to $40,000 (as opposed to the $100,000 requested), this will increase the recovery to the class members by $60,000 total, and the average net recovery for a class member will be about

---

[8] Plaintiffs offer this amount as $350,383.34, but this is an incorrect calculation, based on litigation costs that have since been reduced from the anticipated $130,000 to the now requested amount of $123,856.68. (ECF No. 258-1, p. 11).

$1,190.08.[9] And the average net recovery for an aggrieved employee would be about $69.44.[10]

This is a non-reversionary settlement, meaning that no portion of the GSA will revert to Defendants; for example, because the Court will award $60,000 less than requested for a total incentive award, the leftover $60,000 will go to the class members, not Defendants. (ECF No. 258-1, pp. 8, 12). As part of the settlement, all class members who do not opt out, and all aggrieved employees, will release claims generally related to the facts underlying this action.[11] (*Id.* at 12). Additionally, the named Plaintiffs waive their rights as to unknown claims under California Civil Code § 1542.[12] (*Id.*).

Settlement payments will be mailed by check, and class members and aggrieved employees will have 180 calendar days after the mailing of the check to cash it. (*Id.* at 11). If a check is not timely cashed, the funds will be issued to the California Controller's Unclaimed Property Fund in the name of the person to whom the check was issued. (*Id.* 11-12).

## II.    SERVICE OF THE CLASS NOTICE

When the Court granted Plaintiffs' motion for preliminary approval, it authorized the issuance of the class notice. (ECF No. 257, p. 33). Plaintiffs state as follows on this issue:

> On or about July 25, 2025, the Settlement Administrator distributed the Court-approved Class Notices to 350 Class Members in English and Spanish. (Hernandez Decl. at ¶¶ 5–13.) The notice included all information pertaining to the final approval hearing, the telephone number for the Settlement Administrator, and the telephone numbers and contact information for Class Counsel. (*See id.* at Ex. A.) In accordance with the Court's preliminary approval order, the notice also advised class members that they could exclude themselves or object to the Settlement by September 8, 2025. (*See id.*)
>
> As of the date of filing of this Motion, all but 18 notices have been successfully

---

[9] This amount is obtained by dividing the net settlement of $416,526.66 (this amount is based off a total incentive award of $40,000 rather than the proposed $100,000) by the 350 class members.

[10] This amount is obtained by dividing the net PAGA recovery of $18,750 by the 270 aggrieved employees.

[11] Aggrieved employees cannot opt out of the PAGA settlement. *See O'Connor v. Uber Techs.*, Inc., 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016) ("In short, because the employee's PAGA action acts as a 'substitute' for a governmental action, the judgment binds all those who would be bound by an action brought by the government, including nonparty employees. Thus, in a lawsuit which asserts . . . PAGA claims and seeks class certification for labor/wage claims, even class members who opt out of the class would be bound by an adverse PAGA judgment or settlement.") (citation omitted).

[12] Section 1542 provides as follows: "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

> mailed or remailed. (*Id.* at ¶¶ 5–13.) Only one class member has submitted a
> request for exclusion and none have objected to the Settlement. (*Id.* at ¶¶ 5–13.)
> This unanimously positive response speaks directly to the fairness, reasonableness,
> and adequacy of the Settlement.

(ECF No. 258-1, pp. 12-13; *see* ECF No. 258-8, p. 3 – "As of the date of this declaration, 50 Notice Packets have been returned to our office as undeliverable. ILYM Group performed a computerized skip trace on the 50 returned Notice Packets that did not have a forwarding address, in an effort to obtain an updated address for purpose of re-mailing the Notice Packet. As a result of this skip trace, 32 updated addresses were obtained and the Notice Packets were promptly re-mailed to those Settlement Class Members, via U.S First Class Mail.").

As noted above, none of the putative class members filed objections or anything with the Court, nor did any of them appear at the hearing.

## III.    LEGAL STANDARDS FOR CLASS CERTIFICATION AND SETTLEMENT AND APPROVAL OF PAGA REPRESENTATIVE ACTION

A court tasked with determining whether to approve a proposed class action settlement will almost always be confronted with a "difficult balancing act." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015). "On the one hand, . . . there is a strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Id.* (internal quotation marks and citations omitted). "But on the other hand, settlement class actions present unique due process concerns for absent class members, and the district court has a fiduciary duty to look after the interests of those absent class members." *Id.* (internal quotation marks and citations omitted). "To ensure the interests of the absent class members are properly safeguarded, the judge must adopt the role of a skeptical client and critically examine the class certification elements, the proposed settlement terms, and procedures for implementation." *Lusk v. Five Guys Enterprises LLC*, No. 1:17-CV-00762-AWI-EPG, 2021 WL 2210724, at *2 (E.D. Cal. June 1, 2021) (internal quotation marks and citation omitted).

Class actions are governed by Federal Rule of Civil Procedure 23. There are two stages to approving a class action settlement. In the first stage, "the court preliminarily approves the settlement pending a fairness hearing, temporarily certifies a settlement class, and authorizes notice to the class." *Ontiveros v. Zamora*, 303 F.R.D. 356, 363 (E.D. Cal. 2014). The Court has completed this stage, issuing an order preliminarily certifying the class and approving the

8

1    settlement on June 16, 2025. (ECF No. 257).

2           At the second stage, at issue here, the Court holds a final approval hearing, entertaining

3    objections from putative class members, and thereafter making "a final determination as to

4    whether the parties should be allowed to settle the class action pursuant to the terms agreed

5    upon." *Ontiveros*, 303 F.R.D. at 363.

6           "Parties seeking class certification must satisfy each of the four requirements of Rule

7    23(a)—numerosity, commonality, typicality, and adequacy—and at least one of the requirements

8    of Rule 23(b)," with Plaintiffs arguing here that, under Rule 23(b)(3), common questions of law

9    or fact predominate over individual class member questions and that a class action is superior to

10   other methods for fairly and efficiently adjudicating this case. *Briseno v. ConAgra Foods, Inc.*,

11   844 F.3d 1121, 1124 (9th Cir. 2017); (ECF No. 253-1, p. 20).[13] Plaintiffs bear the burden of

12   showing these requirements. *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1308 (9th Cir.
     1977).

13          After the certification inquiry, the Court considers whether the settlement is "fair,

14   reasonable, and adequate" under Rule 23(e)(2). *See Kim v. Allison*, 8 F.4th 1170, 1178 (9th Cir.

15   2021) (describing factors guiding inquiry under Rule 23(e)(2)). The Court will evaluate the

16   settlement agreement "as a whole" and "for overall fairness." *Hanlon v. Chrysler Corp.*, 150 F.3d

17   1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564

18   U.S. 338 (2011). The Court does "not have a duty to maximize settlement value for class

19   members," but instead, the "inquiry is much more modest and limited to ensuring that the class

20   settlement is fair, reasonable, and adequate." *In re California Pizza Kitchen Data Breach Litig.*,

21   129 F.4th 667, 678 (9th Cir. 2025).

22          Plaintiffs' PAGA claims are pursued in a representative capacity and differ from a class

23   action. *See Kim v. Reins Int'l California, Inc.*, 9 Cal. 5th 73, 86, 459 P.3d 1123, 1130 (2020)

24   ("Although representative in nature, a PAGA claim is not simply a collection of individual claims

25   for relief, and so is different from a class action."); *see also Viking River Cruises, Inc. v. Moriana*,

26   596 U.S. 639, 644 (2022*)* (quoting Cal. Lab. Code Ann. § 2699(a) ("PAGA authorizes any

27

28   _____
     [13] Because Plaintiffs do not address certification in their final approval motion, the Court will at times cite
     their motion for preliminary approval, which did provide argument on this issue. (ECF No. 253).

1    'aggrieved employee' to initiate an action against a former employer 'on behalf of himself or

2    herself and other current or former employees' to obtain civil penalties that previously could have

3    been recovered only by the State in an LWDA enforcement action."). "PAGA actions need not

4    satisfy Rule 23 class certification requirements." *Hamilton v. Wal-Mart Stores*, Inc., 39 F.4th 575,

5    583 (9th Cir. 2022).

6        However, PAGA claims still require court approval under California Labor Code

7    § 2699(*l*)(2). This provision also requires a plaintiff to submit a proposed settlement to the

8    LWDA. "Although there is no binding authority setting forth the proper standard of review for

9    PAGA settlements, California district courts have applied a Rule 23-like standard, asking whether

10    the settlement of the PAGA claims is fundamentally fair, adequate, and reasonable in light of

11    PAGA's policies and purposes." *Clayborne v. Lithia Motors, Inc.*, No. 1:17-CV-00588-AWI-

12    BAM, 2022 WL 16701278, at *2 (E.D. Cal. Oct. 24, 2022) (internal quotation marks and

13    citations omitted).

## IV.    ANALYSIS

14        The Court will begin with the Rule 23(a) factors regarding class certification[14] and then

15    turn to the Rule 23(e) factors regarding approval of the settlement.

16        As an initial matter, the Court notes that the assigned District Judge certified certain

17    classes on January 18, 2019. (ECF No. 161). Specifically, the District Judge certified two classes,

18    with the first class containing six subclasses. (*Id.* at 13). Plaintiffs seek certification here because

19    they only desire to certify a single class, *i.e.*, "all non-exempt employees of MM 879, Inc., who

20    performed work in California from April 6, 2007, through January 18, 2019." (ECF No. 253-1,

21    pp. 13, 18). This definition is similar to one of the classes previously certified by the District

22    Judge: "All current and former non-exempt employees of MM 879 who: (a) Resided within

23    California at any time while performing duties as Home Cleaners, Merry Maids Certified

24    Cleaners, or Team Members (or equivalent), from April 6, 2007, through the date of certification;

25    and, (b) Are members of one or more Subclasses." (ECF No. 161, pp. 12-13).

26    \\\

27
_____

28    [14] Because the Court only conditionally certified the class in its order preliminarily approving the parties'
settlement agreement, final certification of the class is required. (*See* ECF No. 257, p. 32).

**A.     Rule 23(a) Requirements**

**1.     Numerosity**

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "The numerosity requirement requires examination of the specific facts of each case and imposes no absolute limitations." *Gen. Tel. Co. of the Nw. v. Equal Employment Opportunity Comm'n*, 446 U.S. 318, 330 (1980). Courts in the Ninth Circuit have found the requirement satisfied when the class is composed of as few as thirty-nine members. *See Murillo v. Pac. Gas & Elec. Co.*, 266 F.R.D. 468, 474 (E.D. Cal. 2010) (citing *Jordan v. L.A. County*, 669 F.2d 1311, 1319 (9th Cir. 1982) (noting that class sizes of thirty-nine, sixty-four, and seventy-one are sufficient to satisfy the numerosity requirement), *vacated on other grounds*, 459 U.S. 810, 103 (1982)).

Here, joinder of the 350 class members as plaintiffs would be impracticable. (ECF No. 253-1, p. 18.) Thus, the Court finds the numerosity requirement satisfied.

**2.     Commonality**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Class members need not "have all suffered a violation of the same provision of law"; rather, their claims must "depend upon a common contention." *Dukes*, 564 U.S. at 350. The "common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "Indeed, Rule 23(a)(2) has been construed permissively." *Id.* "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The claims here are based on company-wide policies and practices that allegedly led to labor violations, such as failure to pay minimum wages. (*See* ECF No. 253-1, p. 18). Thus, the Court finds the commonality requirement satisfied. *See Kincaid v. Educ. Credit Mgmt. Corp., Inc.*, No. 2:21-CV-00863-TLN-JDP, 2024 WL 1344595, at *4-10 (E.D. Cal. Mar. 29, 2024) (finding commonality requirement met for similar Labor Code claims); *Goodwin v. Winn Mgmt.*

11

1  *Grp. LLC*, No. 1:15-CV-00606-DAD-EPG, 2017 WL 3173006, at *6 (E.D. Cal. July 26, 2017)

2  (same).

3  ### 3.    Typicality

4  Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

5  of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). As the Ninth Circuit has

6  explained, "[t]he test of typicality refers to the nature of the claim or defense of the class

7  representative, and not to the specific facts from which it arose or the relief sought." *Jones v.*

8  *Shalala*, 64 F.3d 510, 514 (9th Cir. 1995) (citing *Hanon*, 976 F.2d at 508).

9  While representative claims must be "reasonably co-extensive with those of absent class

10  members," they "need not be substantially identical." *Hanlon*, 150 F.3d at 1020.  Here, as

11  Plaintiffs note, their "claims are predicated on allegedly uniform policies and practices that

12  applied equally to all proposed class members." (ECF No. 253-1, p. 19). The Court finds the

13  typicality requirement satisfied.

### 4.    Adequacy of representation

14  Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect

15  the interests of the class." "[A] class representative must be part of the class and 'possess the

16  same interest and suffer the same injury' as the class members." *Amchem Prod., Inc. v. Windsor*,

17  521 U.S. 591, 625-26 (1997) (citations omitted). "The proper resolution of this issue requires that

18  two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of

19  interest with other class members and (b) will the named plaintiffs and their counsel prosecute the

20  action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462

21  (9th Cir. 2000), *as amended* (June 19, 2000) (citations omitted).

22  The Court has already conditionally approved the named Plaintiffs as class

23  representatives, (ECF No. 257, p. 32), based on their representations that they can adequately

24  represent the class, have contributed to the litigation and will continue to do so, and have no

25  conflicts of interest, (ECF No. 253-1, pp. 19-20).

26  Likewise, the Court conditionally approved Plaintiffs' attorneys as class counsel. (ECF

27  No. 257, p. 32). As for counsel, "[t]he competence of counsel seeking to represent a class" may

28  be evaluated by considering whether they "are labor lawyers experienced in class actions." *Loc.*

1    *Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162

2    (9th Cir. 2001). Here, counsel represented that they

3        are highly-qualified attorneys with significant experience litigating wage-and-hour
         class action cases and in serving as class counsel. [They] also both assert that no

4        conflicts of interest have arisen that would preclude them from serving as Class
         Counsel or compromise the adequacy of their representation of Plaintiffs or the

5        Settlement Class.

6    (ECF No. 253-1, p. 19). Further, counsel have provided declarations listing numerous class action

7    cases that they have been involved in. (ECF No. 258-2, pp. 3-5; ECF No. 258-3, pp. 28-29).

8    Accordingly, the Court finds the adequacy requirement satisfied.

9        **B.       Rule 23(b) Requirements**

10       Plaintiffs seek certification under Rule 23(b)(3), which requires that "questions of law or

11   fact common to class members predominate over any questions affecting only individual

12   members, and that a class action is superior to other available methods for fairly and efficiently

13   adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); (ECF No. 253-1, p. 20). The test of Rule

14   23(b)(3) is "far more demanding," than that of Rule 23(a). *Wolin v. Jaguar Land Rover N. Am.*,

15   LLC, 617 F.3d 1168, 1172 (9th Cir. 2010) (quoting *Amchem*, 521 U.S. at 623-24).

         **1.       Predominance**

16       First, questions of law or fact common to class members must predominate over any

17   questions affecting only individual members. Fed. R. Civ. P. 23(b)(3). This "predominance

18   inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

19   representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). "This analysis

20   presumes that the existence of common issues of fact or law have been established pursuant to

21   Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3)."

22   *Id.* "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common

23   and individual issues." *Id.* "When common questions present a significant aspect of the case and

24   they can be resolved for all members of the class in a single adjudication, there is clear

25   justification for handling the dispute on a representative rather than on an individual basis." *Id.*

26   (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice &*

27   *Procedure* § 1778 (2d ed.1986)).

28       Here, there are issues that will predominate over individual issues in the case, specifically

1    whether the employment policies at issue violated California law. Because "[a] common nucleus

2    of facts and potential legal remedies dominates this litigation," the Court finds that the

3    predominance requirement is met. *Hanlon*, 150 F.3d at 1022.

####    2.    Superiority

5    Under Rule 23(b)(3), a class action must be "superior to other available methods for fairly

6    and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Pertinent to this finding is:

7    (A) the class members' interests in individually controlling the prosecution or
     defense of separate actions; (B) the extent and nature of any litigation concerning
8    the controversy already begun by or against class members; (C) the desirability or
     undesirability of concentrating the litigation of the claims in the particular forum;
9    and (D) the likely difficulties in managing a class action.

10   Fed. R. Civ. P. 23(b)(3)(A)-(D); *see Amchem*, 521 U.S. at 616.

11   The purpose of this "requirement is to assure that the class action is the most efficient and

12   effective means of resolving the controversy," and "[w]here recovery on an individual basis

13   would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of

14   class certification." *Wolin v. Jaguar Land Rover N. Am.*, LLC, 617 F.3d 1168, 1175 (9th Cir.

15   2010) (citation omitted); *see Local Joint Exec. Bd. of Culinary/Bartender Tr. Fund v. Las Vegas

16   Sands*, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This case involves multiple claims for relatively

17   small individual sums. . . . If plaintiffs cannot proceed as a class, some – perhaps most – will be

18   unable to proceed as individuals because of the disparity between their litigation costs and what

     they hope to recover.").

19   The Court concludes that a class action is a superior method of resolving this action. First,

20   it does not appear economical for each class member to bring their claims separately. The class

21   action litigation here allows the class members to pool their individual claims together, which

22   claims may otherwise not be economical to litigate. *See Local Joint Exec. Bd. of

23   Culinary/Bartender Tr. Fund v. Las Vegas Sand*s, 244 F.3d 1152, 1163 (9th Cir. 2001) ("This

24   case involves multiple claims for relatively small individual sums. . . . If plaintiffs cannot proceed

25   as a class, some – perhaps most – will be unable to proceed as individuals because of the disparity

26   between their litigation costs and what they hope to recover."). Further, lack of knowledge of the

27   legal system and limited economic resources would also likely deprive most class members of the

28   opportunity to pursue their claims outside of a class action.

Second, there also does not appear to be any related pending litigation. Third, this District is a desirable forum for the litigation as the operative complaint alleges that "Plaintiffs primarily performed their work for Defendants within the City and County of Fresno." (ECF No. 94, p. 10). Thus, much of the evidence will likely be found within this District and court proceedings may proceed efficiently here. *See Soares v. Flowers Foods, Inc.*, 320 F.R.D. 464, 486 (N.D. Cal. 2017) ("This case involves drivers who serviced routes in Northern California, many of whom worked out of Flowers warehouses in San Jose and Salinas, which are in this District. Because much of the evidence will be found here, it would be efficient to try the case here."). Finally, there are no apparent difficulties likely to be encountered in managing this class action. Thus, the Court finds that the superiority requirement is met.

### C.    Rule 23(e) Requirements

If a proposed settlement agreement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A court considers whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has provided the following guidance regarding Rule 23(e)(2):

> In this Circuit, a district court examining whether a proposed settlement comports with Rule 23(e)(2) is guided by the eight "*Churchill* factors," viz., "(1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members of the proposed settlement."

*Kim*, 8 F.4th at 1178 (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 946 (9th

Cir. 2011)); *see Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) (listing the *Churchill* factors). "In addition, the settlement may not be the product of collusion among the negotiating parties." *In re Mego*, 213 F.3d at 458. "This list is not exclusive and different factors may predominate in different factual contexts." *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993) (citations omitted).

Moreover, consideration of these factors alone is insufficient. *Id.* at 1179. Because Rule 23(e)(2) also requires courts to "now consider 'the terms of any proposed award of attorney's fees' when determining whether 'the relief provided for the class is adequate[,]' . . . courts must balance the 'proposed award of attorney's fees" vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Briseño v. Henderson*, 998 F.3d 1014, 1024 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). This is done by reviewing the "so-called *Bluetooth* factors to smoke out potential collusion." *Id.* at 1023. Signs of such collusion include:

> (1) "when counsel receive[s] a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing arrangement,'" under which the defendant agrees not to challenge a request for an agreed-upon attorney's fee; and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class.

*Id.* (quoting *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d at 947).

The Court will begin with the *Churchill* factors and then turn to collusion, the *Bluetooth* factors, and other considerations.

### 1.    The strength of Plaintiffs' case

A court should "evaluate objectively the strengths and weaknesses inherent in the litigation and the impact of those considerations on the parties' decisions to reach these agreements." *Adoma v. Univ. of Phoenix, Inc.*, 913 F.Supp.2d 964, 975 (E.D. Cal. 2012) (citation omitted). However, "the court does not reach any ultimate conclusions regarding the contested issues of fact and law that underlie the merits of this litigation." *Id.* (internal citation and quotation marks omitted).

In support of the parties' proposed settlement, Plaintiffs assert that various risks and defenses warrant reductions in the maximum value of the claims.

\\\

1

### a.    BBSI liability

2       MM 879, who employed Plaintiffs as cleaning employees, contracted with BBSI for

3  certain administrative tasks, like payroll processing services. (ECF No. 258-3, p. 2). And as noted

4  above, the assigned District Judge initially granted summary judgment to BBSI, concluding that it

5  was not a joint employer of Plaintiffs, but the Ninth Circuit reversed that decision because

6  "Plaintiffs . . .  presented evidence that BBSI retained the right to terminate MM 879 employees

7  with or without cause, even if it did not exercise that right," and in the "Employee Handbook for

8  MM 879 employees, BBSI is unambiguously characterized as a joint employer" although "[s]uch

9  characterization, standing alone, is not necessarily enough to create an employment relationship."

10  (ECF No. 205, pp. 5, 6).

11       With this background in mind, Plaintiffs asserted at the preliminary approval stage that

12  "the most significant risk factor was Plaintiffs' ability to establish at trial that BBSI was a joint

13  employer of Plaintiffs and the Class Members, and should thus be held jointly and severally liable

14  for the alleged wage and hour violations." (ECF No. 253-1, p. 21). Regarding the legal viability

15  of this issue, Plaintiffs' counsel has provided a declaration in support of the final approval motion

    stating as follows:

16       Plaintiffs remain confident in their interpretation of the law and believe that
         BBSI's right to terminate MM 879's employees renders it a joint employer under
17       California law and renders it liable for the wage and hour violations at issue here.
         However, Plaintiffs are also cognizant of several possible outcomes in this case.
18       First, BBSI has already been successful in obtaining summary judgment on this
         issue, and it is possible another motion could likewise be successful on different
19       grounds. Second, it will be Plaintiffs' burden to prove the joint employer
         relationship at trial, and it is possible a jury could find that BBSI did not
20       practically have the power or ability to terminate MM 879's employees, despite
         the language of their contractual agreement. Third, even if Plaintiffs succeed in
21       establishing that BBSI was their and the Class Members' joint employer, Plaintiffs
         will have the additional hurdle of establishing that BBSI should be held jointly and
22       severally liable for the alleged wage and hour violations. As discussed in *Serrano
         v. Aerotek, Inc.*, 21 Cal. App. 5th 773, 783 (2018), *disapproved on other grounds
23       by Donohue v. AMN Servs., LLC*, 11 Cal. 5th 58 (2021), a joint employer is not
         automatically liable for the wage and hour violations of other employers simply by
24       virtue of its joint employer relationship. *See id.* Accordingly, it is possible
         Plaintiffs could prove that BBSI was a joint employer, and a jury could still find
25       that BBSI was not responsible for and is not liable for the alleged wage and hour
         violation.
26
27  The risk of being unable to establish BBSI's liability for the alleged wage and hour

28

1
2
3
4
5

> violations is extremely significant in this case, because information obtained in discovery and in settlement discussions indicates that MM 879, as a small employer, would be financially unable to satisfy a judgment. The very likely result of a fair judgment against only MM 879 is that MM 879 would be required to petition for bankruptcy. Indeed, MM 879 has made numerous representations that it would be required to file for bankruptcy if required to pay its own attorneys to defend the case through trial, given the great costs associated with trying a case.

6

> Accordingly, the likelihood of any meaningful recovery for the Class Members hinges on Plaintiffs establishing BBSI's liability at trial.

7

(ECF No. 258-3, pp. 11-12).

8
9

Having discussed this general risk of proceeding without a settlement, the Court turns to Plaintiffs' substantive claims.

10

**b.    Failure to Pay Minimum Wages**

11
12
13
14
15
16
17
18

Plaintiffs' failure-to-pay-minimum-wages claims are mainly based on Labor Code §§ 1197 and 1194(a), which require the payment of a minimum wage and provide employees the right to recover in a civil action if they are not paid accordingly. (ECF No. 94, p. 19). Plaintiffs contend that MM 879 used a percentage pay model (or what they call a piece-rate compensation) for cleaners, *i.e.*, employees were paid a percentage of the cleaning fee collected from the customer. (ECF No. 258-3, pp. 12-13). However, employees were not paid a minimum wage after factoring in nonproductive time, such as picking up supplies. *See* Cal. Lab. Code § 226.2(a)(4) (requiring employees compensated on a piece-rate basis to "be compensated for other nonproductive time at an hourly rate that is no less than the applicable minimum wage").

19
20
21
22
23

As for supporting evidence, Plaintiffs state that, while being deposed, MM 879 Owner and CFO Jeff Skadburg admitted "that employees were not paid an hourly rate for nonproductive time, and to calculate an employee's hourly rate of pay under the 'percentage pay' compensation model, MM 879 merely divided the employee's weekly 'percentage pay' compensation by the number of weekly work hours reported by the employee." (ECF No. 258-3, p. 14).

24
25
26

In valuing these claims, Plaintiffs' expert, Keith Mendes, had to rely on estimates of non-productive time because it was never tracked.[15] For example, driving time may range from 30 minutes to 3 hours depending on the assignment. (*Id.*). "Accordingly, Plaintiffs' initial exposure

27
28

---

[15] Plaintiffs cite Mendes' expert report in various parts of their motion, which was filed on the record on May 30, 2024. (ECF No. 238). Generally, the report provides the basis for the valuation of their claims, as will be discussed.

estimates fell on an average of approximately 90 minutes per day. (*Id.* at 15). Based on Mr. Mendes' report, this resulted in overall exposure of $750,903 for unpaid non-productive time, exclusive of interest." (*Id.*).

### c.    Failure to Provide Meal Periods

Plaintiffs' failure-to-provide-meal-periods claims are mainly based on Labor Code §§ 512 and 226.7, which generally require at least a 30-minute meal break for a work period of more than 5 hours per day and provide a penalty of 1 additional hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided. (ECF No. 94, p. 22).

As for supporting evidence, Plaintiffs contend that "MM 879's meal period policy either omits or misstates several aspects of the employee's entitlement to meal periods under California law," which can be used to establish liability. (ECF No. 258-3, p. 16). Additionally, for a certain time period, MM 879 did not maintain records for employee meal periods; rather, employees used handwritten timecards, which Plaintiffs assert triggers a rebuttable presumption of meal-period violations. (*Id.* at 17). Owner and CFO Jeff Skadburg "conceded in deposition testimony that MM 879 has no way of knowing whether employees actually took meal periods during the period of time in which handwritten timecards were used." (*Id.*).

Moreover, "despite not knowing whether any employee actually received a meal period, MM 879 had a class-wide practice of automatically deducting one hour of pay from its employees' hours, resulting in additional off-the-clock work and unpaid minimum and overtime wages." (*Id.*). Lastly, after MM 879 transitioned to an electronic timekeeping system, "despite being specifically required to record a one-hour meal period each day, MM 879's employees were required to drive between cleaning assignments while eating their lunch, and therefore were not relieved of duty during meal periods." (*Id.* at 18). At their depositions, "Plaintiffs unanimously testified that they did not receive a reasonable opportunity to take an off-duty meal period, and were in fact instructed by MM 879 management to continue working during their lunch." (*Id.*).

Regarding risks, Plaintiffs state that, even though there was a deficient policy, liability would likely be limited to instances where time records would corroborate a non-compliant meal period. (*Id.*). And providing proof of meal-period violations would be difficult because there are records showing a meal period was taken (although Plaintiffs contend these records are incorrect),

thus necessitating class members to provide testimony as to whether they took meal periods on workdays where meal periods were recorded. (*Id.* at 19). And providing such testimony would be "further complicated by the difficulty in maintaining long-term contact with Class Member witnesses during the many years this case has been pending." (*Id.*). "Accordingly, Plaintiffs perceived a risk of decertification as to the issue of whether the Class Members were required to work through meal periods on days where a meal period was actually recorded." (*Id.*).

In valuing these claims, Plaintiffs' expert determined that "Defendants faced up to $139,756 in exposure for failure to provide meal periods, exclusive of interest." (*Id.*).

### d.    Failure to Provide Rest Periods

Plaintiffs' failure-to-provide-rest-periods claims are mainly based on Cal. Code Regs. tit. 8, § 11040, subd. (12) and Labor Code § 226.7, which generally require a 10-minute rest break per 4 hours of work and provide a penalty of 1 additional hour of pay at the employee's regular rate of compensation for each workday that the rest period is not provided. (ECF No. 94, p. 24). Additionally, Labor Code § 226.2(a)(1) requires that, for employees compensated on a piece-rate basis, they still must be "compensated for rest and recovery periods and other nonproductive time separate from any piece-rate compensation."

As for supporting evidence, Plaintiffs contend that there is evidence indicating that "MM 879 did not provide separate compensation for rest periods, in violation of California's requirement that rest periods be paid." (ECF No. 258-3, p. 20). "Thus, even assuming for the sake of argument that the Class Members were relieved of duty for minimum 10-minute rest breaks, it is undisputed that any such breaks were unpaid . . . ." (*Id.*).

In valuing these claims, Plaintiffs' expert "assumed that for any shift over 3.5 hours, any rest periods taken by the Class Members were unpaid during the time that the percentage pay compensation model was in effect" and "then applied a premium based on the Class Members' regular rate of pay for each workday over 3.5 hours during that same timeframe." (*Id.*). This resulted in an "overall exposure for failure to provide rest periods . . . calculated to be $421,444, exclusive of interest." (*Id.*).

\\\

\\\

20

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**e.    Failure to Provide Accurate and Itemized Wage Statements**

Plaintiffs' failure-to-provide-accurate-and-itemized-wage-statement claims derive from their other claims, *e.g.*, then contend that because they were not properly compensated for meal and rest periods, their wage statements were inaccurate. (ECF No. 258-3, p. 21). These claims are based on Labor Code § 226, which generally requires an employer to provide employees with accurate itemized wage statements showing a variety of information (including gross wages earned and total hours worked) and penalizes knowing and intentional failures to do so by permitting recovery of $50 for the initial pay period in which a violation occurs and $100 per employee for each violation in a subsequent pay period, not to exceed an aggregate penalty of $4,000. (ECF No. 94, pp. 25-26).

Regarding risks, Plaintiffs state that, "because [their] wage statement claim is entirely derivative on the underlying alleged failures to pay minimum and overtime wages and to provide meal and rest periods, the same reductions and adjustments applied above are warranted on this claim, for the same reasons articulated above." (ECF No. 258-3, pp. 22). Additionally, they note that, under California law, there is the risk that Defendants could assert a good faith defense that their meal-and-rest-period policies were legally compliant:

> Therefore, Defendants' potential exposure will significantly decrease, because their ability to present a good-faith defense with respect to the meal/rest period aspect of Plaintiffs' wage statement claim presents additional risks to Plaintiffs' ability to establish their claim on a class-wide basis, and the assertion of a good-faith defense may also generate individualized inquiries rendering class treatment of this theory of liability unmanageable. Indeed, a large portion of Defendants' liability for wage statement violations is driven by their underlying exposure for failure to provide meal periods. Accordingly, there is a substantial risk that Defendants will be able to mount a credible good-faith defense, because it may not have intended nor even had knowledge of any failure to pay meal period premium wages.

(*Id.*).

In valuing these claims, Plaintiffs' expert determined that "Defendants' exposure for failure to provide wage statements is calculated to be up to $171,376." (*Id.* at 21). For this valuation, they used only the initial violation penalty rate—*i.e.*, $50—because Plaintiffs are not aware of past cases where MM 879 has been notified by the Labor Commissioner or a court that its wage statements violated the law, citing caselaw indicating that lack of notice of Labor Code

provisions may provide a good faith defense to heightened penalties. (*Id.* at 22). Based on the risks for these claims, Plaintiffs estimate a risk-adjusted value of $100,000. (*Id.*).

### f.    Failure to Pay All Wages Due and Owing Upon Termination

Plaintiffs' failure-to-pay-all-wages-due-and-owing-upon-termination-of-employment claims likewise derive from their other claims, *e.g.*, then contend they were still owed unpaid minimum and overtime wages when they separated from employment. (ECF No. 258-4, p. 23). These claims are based on Labor Code §§ 201 and 202, which general require employers to pay all wages due when an employee leaves employment within certain timeframes depending on the circumstances. Section 203 penalizes failure to comply with §§ 201 and 202 by providing that an employee's wages will continue as a penalty from the due date at the same rate until paid, or an action is commenced, but not for more than 30 days.

Regarding risks, Plaintiffs rely on the same risks offered for their failure-to-provide-accurate-and-itemized-wage-statements claims, *i.e.*, they may not succeed on the underlying claims and Defendants may be able to present good-faith defenses. (*Id.* at 23-24).

In valuing these claims, Plaintiffs' expert determined that "Defendants' liability for waiting time penalties is calculated to be up to $286,499." (*Id.* at 23). Based on the specific risks for these claims, Plaintiffs estimate a risk-adjusted value of $140,000. (*Id.* at 24).

### g.    PAGA claims

"Although the court does not evaluate the settlement of PAGA claims under the Rule 23 criteria, it must still inquire into the fairness of the PAGA settlement." *Wells v. DCI Donor Servs., Inc.*, No. 2:21-CV-00994-CKD, 2024 WL 4436905, at *11 (E.D. Cal. Oct. 7, 2024). Courts apply standards like Rule 23 in making this assessment, asking if the PAGA settlement is fair, adequate, and reasonable. *See, e.g.*, *Mondrian v. Trius Trucking, Inc.*, No. 1:19-CV-00884-DAD-SKO, 2022 WL 2306963, at *7 (E.D. Cal. June 27, 2022) (applying Rule-23 like standard to PAGA claims). Plaintiff estimates the maximum potential value of these claims at $1 million (without stacking penalties) and $2.5 million (with stacking). (ECF No. 258-3, p. 24).

Regarding risks, Plaintiffs rely on the same risks offered for their claims discussed above, and contend that California courts have largely rejected arguments to stack PAGA penalties and that PAGA penalties could be reduced based on the Court's discretion. (*Id.* at 24-26).

Based on these risks, "Plaintiffs estimate the realistic exposure under PAGA," or what the Court will consider to be the assigned risk-adjusted value, "to be in the range of $100,000." (*Id.* at 26).

### h.    Conclusion

The following table summarizes the valuation of the claims discussed above.

| CLAIMS | MAXIMUM POTENTIAL VALUE | Risk-Adjusted Amount | Percentage Risk-Adjusted Discount of Claim |
|---|---|---|---|
| **Failure to Pay Wages** | $750,903 | $750,903 | 0% |
| **Failure to Provide Meal Periods** | $139,756 | $139,756 | 0% |
| **Failure to Provide Rest Periods** | $421,444 | $421,444 | 0% |
| **Wage Statement Penalties** | $171,376 | $100,000 | 42% |
| **Waiting Time Penalties** | $286,499 | $140,000 | 51% |
| **PAGA** | $2,500,000 | $100,000 | 96% |
| **TOTALS** | **$4,269,978** | **$1,652,103** | 61% |

The Court concludes that Plaintiffs have adequately explained how they calculated their claims.

### 2.    The risk, expense, complexity, likely duration of further litigation, and risks of maintaining class action status throughout trial

"Approval of settlement is 'preferable to lengthy and expensive litigation with uncertain results.'" *Munoz v. Giumarra Vineyards Corp.*, 2017 WL 2665075, at *9 (E.D. Cal. June 21, 2017). Moreover, "[e]mployment law class actions are, by their nature, time-consuming and

23

1    expensive to litigate." *Aguilar v. Wawona Frozen Foods*, 2017 WL 2214936, at *3 (E.D. Cal May

2    19, 2017).

3          Plaintiffs argue that, without settlement, the parties would need to engage in further

4    litigation, including issues regarding certification or desertification, and perhaps a lengthy and

5    complex trial. (ECF No. 258-1, p. 16).

6          Based on the record evidence, including the discovery taken and strengths and weakness

7    of the case, the Court concludes that this consideration weighs in favor of approving the parties'

8    proposed settlement.

9                    **3.      The amount offered in settlement**

10         The amount offered in settlement "is generally considered the most important" factor of

11   any class settlement. *See Bayat v. Bank of the West*, 2015 WL 1744342, at *4 (N.D. Cal. Apr. 15,

12   2015). In determining whether the amount offered in settlement is fair and reasonable, a court

13   compares the proposed settlement amount to the maximum potential amount recoverable through

14   successful litigation. *See In re Mego*, 213 F.3d at 459. "It is well-settled law that a cash settlement

15   amounting to only a fraction of the potential recovery does not per se render the settlement

16   inadequate or unfair." *Id.* (citation omitted). For complex class action cases, Ninth Circuit has "a

17   strong judicial policy that favors settlements. Parties represented by competent counsel are better

18   positioned than courts to produce a settlement that fairly reflects each party's expected outcome

19   in litigation." *In re Pacific Enter. Sec. Lit.*, 47 F.3d 373, 378 (9th Cir. 1995) (internal quotation

     marks and citation omitted).

20                    **a.      Percentage recovery**

21         If Plaintiff were to prevail on all claims, the estimated potential maximum recovery would

22   be $4,269,978 ($1,769,978 potential maximum for the class claims + $2.5 million potential

23   maximum for the PAGA claims). Of the $2.5 million in potential maximum PAGA penalties the

24   LWDA would receive 75% ($1,875,000) and the remaining 25% ($625,000) would go to the

25   aggrieved employees. *See* Cal. Labor Code § 2699(i). Deducting LDWA's proportion

26   ($1,875,000) of the PAGA penalty from the projected maximum ($4,269,978) leaves $2,394,978

27   going to the class members and aggrieved employees. *See Lusk v. Five Guys Enterprises LLC*,

28   No. 1:17-CV-00762-AWI-EPG, 2022 WL 4791923, at *8 (E.D. Cal. Sept. 30, 2022) (deducting

                                              24

LWDA's portion of estimated PAGA penalty from the projected recovery amount before calculating the percentage rate of recovery). The gross settlement amount ($995,000) is approximately 42% of $2,394,978.

Turning to the net settlement valuation (not the gross settlement amount), and considering the class claims in isolation, the net settlement for the class claims ($416,526.66)[16] is approximately 24% of the recovery of the potential maximum value of the class claims ($1,769,978). Considering the PAGA claims in isolation, the total amount allocated for PAGA penalties ($75,000) is 3% of the potential maximum value of the PAGA claims ($2,500,000).

The below table illustrates these rates of recovery.

| CLAIMS | MAXIMUM POTENTIAL VALUE | SETTLEMENT RECOVERY |
|---|---|---|
| All Claims | $2,394,978 (this figure does not count the amount of PAGA penalties that would go to the LWDA) | 42% (Based on GSA of $995,000) |
| Class Claims | $1,769,978 | 24% (Based on net settlement amount of $416,526.66) |
| PAGA Claims | $2,500,000 | 3% (Based on total PAGA penalties of $75,000) |

Ultimately, the Court finds this recovery reasonable and even above other percentages that courts have approved. *Almanzar v. Home Depot U.S.A., Inc.*, No. 2:20-CV-0699-KJN, 2022 WL 2817435, at *12 (E.D. Cal. July 19, 2022) ("In fact, 10% of the verdict value of non-PAGA claims is generally considered the low end of reasonable recovery.") (internal quotation marks and citation omitted); *see Bravo v. Gale Triangle, Inc.*, 2017 WL 708766, at *10 (C.D. Cal. Feb. 16, 2017) ("Thus, Plaintiffs argue that a settlement for fourteen percent recovery of Plaintiffs'

---

[16] This amount is based off a $40,000 incentive award rather than the $100,000 that Plaintiffs request.

maximum recovery is reasonable under the circumstances. The Court agrees.") (internal citation to record omitted); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 256 (N.D. Cal. 2015) ("From here, the agreed upon common fund represents between 27 percent and 11 percent of the total potential recovery. The Court is satisfied that these numbers are fair.").

In reaching this determination, the Court reiterates that "a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *Nat'l Rural Telecommunications Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 527 (C.D. Cal. 2004).

### b.    Allocation of settlement shares

The Court also considers whether the allocation of the settlement is fair, reasonable and adequate, with it being "reasonable to allocate the settlement funds to class members based on the extent of their injuries or the strength of their claims on the merits." *In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1045 (N.D. Cal. 2008).

The settlement shares will be allocated as follows:

> The Settlement Administrator will calculate the Individual Class Settlement Payments for Participating Class Members. Each Participating Class Member will receive a proportionate share of the Net Settlement Amount that is equal to (i) the number of weeks he or she worked in a non-exempt capacity based on the Class data provided by Defendant, divided by (ii) the total number of weeks worked by all Class Members based on the same Class data, which is then multiplied by the Net Settlement Amount. One day worked in a given week will be credited as a week for purposes of this calculation. Therefore, the value of each Class Member's Individual Settlement Share ties directly to the number of weeks that he or she worked.

> . . . .

> The individual share will be calculated by determining the total number of pay periods during which the PAGA Group Members were employed during the PAGA Period (i.e., the sum of all pay periods of worked by all PAGA Group Members) and dividing $18,750 by that total number of pay periods to determine the monetary value assigned to each PAGA pay period. That number will then be multiplied by the individual PAGA Group Member's total number of pay periods worked during the PAGA Period to determine the Individual PAGA Payment.

(ECF No. 258-8, p. 22; *see* ECF No. 258-1, p. 11 - "Each of the Class Members will be eligible to receive his or her individual share of the Settlement based on the total number of workweeks worked by each Class Member during the Class Period.")

The Court finds this allocation acceptable. Notably, the essence of Plaintiffs' claims is that the class members were paid a piece rate and were not properly paid wages, meal and rest periods, and suffered derivative wage statement and waiting penalties. Accordingly, the allocation of settlement payments based on how much they worked would be fair to the class members and aggrieved employees.

### 4.     The extent of discovery completed and the stage of proceedings; experience and views of counsel

"An initial presumption of fairness is usually involved if the settlement is recommended by class counsel after arm's-length bargaining." *Riker v. Gibbons*, No. 3:08-CV-00115-LRH, 2010 WL 4366012, at *2 (D. Nev. Oct. 28, 2010) (quoting 4 Alba Conte & Herbert B. Newberg, Newberg on Class Actions § 11:42 (4th ed.2002)); *see also Nat'l Rural Telecomms.*, 221 F.R.D. at 527–28 ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair." (citations omitted)).

As noted in the background discussion above, the settlement follows approximately 14 years of litigation in both State and Federal Court, including extensive discovery, dispositive motion practice, and Federal appellate proceedings before the parties reached a settlement following mediation and subsequent negotiations.

Here, Plaintiffs' attorneys have provided declarations, generally summarizing their experience with class action litigation and stating that the settlement is fair and reasonable and in the best interests of the those concerned. (ECF No. 258-2, pp. 3-5, 11; ECF No. 258-3, pp. 28-29). Accordingly, this factor weighs in favor of approval.

### 5.     The presence of a government participant

Although there is no governmental party to this lawsuit, the LWDA may express its views. Under California Labor Code § 2699(*l*)(2), a "proposed settlement shall be submitted to the [LDWA] at the same time that it is submitted to the court" for the LWDA's review and approval.

Plaintiffs' counsel filed a declaration in connection with the preliminary approval motion, stating as follows: "At the time of filing this Motion, our office has submitted a copy of the Agreement to the LWDA in accordance with Labor Code section 2699(l)(2). Attached hereto as 'Exhibit 2' is a true and correct copy of an email my office received from the LWDA confirming

1    our office's submission of the Agreement on April 24, 2025." (ECF No. 253-2, p. 31).

2    Additionally, counsel attached an email that appeared to confirm such submission on April 24,

3    2025. (*Id.* at 87).

4            Further, as Plaintiffs noted, this case was removed under the Class Action Fairness Act

5    (CAFA). (ECF No. 253-1, p. 9, *see* ECF No. 1, p. 2). Under 28 U.S.C. § 1715(b), CAFA requires

6    notice of a proposed class action settlement, and certain documents, to be served by each

7    participating defendant on appropriate state and federal officials not later than 10 days after the

8    filing of a proposed settlement.[17] *Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1075 (9th Cir.

9    2017) (noting this requirement). The Ninth Circuit has described this requirement as follows:

10           Complementing the expansion of federal jurisdiction to ensure uniformity and
             fairness is CAFA's class action settlement notice requirement, 28 U.S.C. § 1715,
11           which was intended to "provide a check against inequitable settlements." S.Rep.
             No. 109–14, at 35 (2005), 2005 WL 627977, at *34; *see In re Uponor, Inc.*, F1807
12           Plumbing Fittings Prods. Liab. Litig., 716 F.3d 1057, 1064–65 (8th Cir.2013).
             Section 1715 requires notice of a proposed settlement to be served on the
13           "appropriate" federal and state officials—typically the Attorney General of the
             United States and "the person in the State who has the primary regulatory or
14           supervisory responsibility with respect to the defendant." 28 U.S.C. § 1715(a). In
             addition, § 1715 prohibits a court from ordering final approval of a proposed
15           settlement until 90 days after the appropriate government officials were notified.
             *Id.* § 1715(d). The statute is equally clear that it shall not "be construed to expand
16           the authority of, or impose any obligations, duties, or responsibilities upon,
             Federal or State officials." *Id.* § 1715(f). These requirements are intended to give
17           states a role in ensuring that citizens are equitably compensated in class action
             settlements, but states are free not to participate, leaving that task to the courts,
18           which ultimately retain discretion to approve or disapprove any settlement,
             regardless of a state's intervention.
19
20    *California v. IntelliGender, LLC*, 771 F.3d 1169, 1172-73 (9th Cir. 2014).

21           Attached to Plaintiffs' supplement in support of their motion for preliminary approval was

22    the declaration of Attorney Laruen Roseman, counsel for BBSI, stating that "on June 6, 2025,

23    Defendant sent Notice of Settlement to the U.S. Department of Justice and the California State

24    Attorney's Office pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715 on behalf of

25    Defendants BBSI and MM 879, Inc." (ECF No. 256-1, p. 2).

26    ────────────────
      [17] Section 1715(b) provides in part as follows: "Not later than 10 days after a proposed settlement of a
27    class action is filed in court, each defendant that is participating in the proposed settlement shall serve
      upon the appropriate State official of each State in which a class member resides and the appropriate
28    Federal official, a notice of the proposed settlement consisting of [various documents and information,
      including the complaint]."

Here, no governmental entity has participated in this case or raised any objection to the settlement. Accordingly, this factor does not weigh against approval.

**6.      The reaction of the class members to the proposed settlement**

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle v. Plaid Inc.*, 340 F.R.D. 356, 376 (N.D. Cal. 2021) (observing that a court may assess the reaction of class members by considering "how many class members submitted claim forms and objections" at the final approval stage).

After the class notice was issued, the class members reacted favorably to the proposed settlement terms in that there were no objections and only a single request for exclusion. (ECF No. 258-1, p. 8). This "absence of a negative reaction[] strongly supports settlement." *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010); *see also Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal. Sept. 29, 2022) ("The lack of any objection weighs in favor of final approval of the settlement"). Accordingly, this factor weighs in favor of final approval.

**7.      Collusion, award of attorneys' fees, and costs**

"The potential for collusion reaches its apex pre-class certification because, among other things, (1) the court has not yet approved class counsel, who would owe a fiduciary duty to the class members; and (2) plaintiffs' counsel has not yet devoted substantial time and money to the case, and may be willing to cut a quick deal at the expense of class members' interests." *Briseño*, 998 F.3d at 1024.

The Court now turns to the *Bluetooth* factors, which are indications courts evaluate to determine whether class counsel have allowed their own interests to infect settlement negotiations—(1) whether counsel receives a disproportionate amount of the settlement; (2) whether there is a clear "sailing agreement"; (3) and whether the agreement contains a "kicker" or "reverter" clause. *Briseño*, 998 F.3d at 1024. The Court "ha[s] an independent obligation to ensure that the award, like the settlement itself, is reasonable, even if the parties have already agreed to an amount." *Bluetooth*, 654 F.3d at 941; *see also Zucker v. Occidental Petroleum Corp.*,

1    192 F.3d 1323, 1328–29 (9th Cir. 1999). Where, as here, fees are to be paid from a common fund,

2    the relationship between the class members and class counsel "turns adversarial." *In re*

3    *Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994). As a result,

4    the Court must assume a fiduciary role for the class members in evaluating a request for an award

5    of attorneys' fees from the common fund. *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968

6    (9th Cir. 2009).

7           The proposed settlement contains a clear sailing provision, *i.e.*, a provision that

8    Defendants will not object to a certain fee request. Notably, it states that Defendants will not

9    oppose a fee award that does not exceed 1/3 of the settlement and will not oppose costs that do

10   not exceed $130,000. (ECF No. 253-1, pp. 52-53). However, there is no "reverter" clause, *i.e.*, a

11   provision that fees not awarded revert to Defendants rather than the class fund. Rather, the

12   settlement agreement expressly states that "no portion of the Gross Settlement Amount shall

13   revert to Defendants." (*Id.* at 38). As for attorneys' fees, the Court concludes, for the reasons

14   given below, the counsel will not receive a disproportionate amount of the settlement and the

15   requested 1/3 fee is otherwise reasonable.

16          The Ninth Circuit has approved two methods for determining attorneys' fees in cases

17   where the award is taken from the common fund set aside for the entire settlement: the

18   "percentage of the fund" method and the "lodestar" method. *Vizcaino v. Microsoft Corp.*, 290

19   F.3d 1043, 1047 (9th Cir. 2002) (citation omitted). The Court retains discretion in common fund

20   cases to choose either method. *Id.*; *Vu v. Fashion Inst. of Design & Merch.*, No. CV 14-08822

21   SJO (EX), 2016 WL 6211308, at *5 (C.D. Cal. Mar. 22, 2016). Under either approach,

22   "[r]easonableness is the goal, and mechanical or formulaic application of either method, where it

23   yields an unreasonable result, can be an abuse of discretion." *Fischel v. Equitable Life Assurance*

24   *Soc'y of the U.S.*, 307 F.3d 997, 1007 (9th Cir. 2002).

25          Under the percentage of the fund method, the Court may award class counsel a given

26   percentage of the common fund recovered for the class. *Id.* In the Ninth Circuit, a twenty-five

27   percent award, is the "benchmark" amount of attorneys' fees, but courts may adjust this figure if

28   the record shows special circumstances justifying a departure. *Six (6) Mexican Workers v. Ariz.*

*Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990)). The Ninth Circuit has permitted courts to

award attorneys' fees using this method "in lieu of the often more time-consuming task of calculating the lodestar." *Bluetooth*, 654 F.3d at 942. In evaluating a percentage for attorneys' fees, the Court is required to "consider[] all the circumstances of the case and reach a reasonable percentage." *Vizcaino*, 290 F.3d at 1048. Such circumstances include (1) the results reached for the class; (2) the risk to class counsel; (3) counsel's performance; (4) the amount sought to be awarded compared to other cases; and (5) the contingent nature of counsel's fee. *Id.* at 1048-49.

Here, Plaintiffs' counsel has requested fees of $331,666.66, or 1/3 of the gross settlement. (ECF No. 258-1, p. 21). The Court will use the percentage-of-the-fund method to evaluate the reasonableness of this request, but as explained further below, will also conduct a cross-check of this amount by considering the lodestar method.

Starting with the results achieved for the class, as explained above, counsel achieved a 24% recovery of the potential maximum value of the class claims. In consideration with the other circumstances discussed below, the Court concludes that this result supports a 1/3 fee award.

Moving to the risk to class counsel, including the contingency nature of the fee, Attorney Sutton's declaration states as follows:

> During the time this case was pending, I turned down dozens of potential cases due to, among other reasons, the fact that it was unclear how this case was going to be resolved and the amount of time and expense that might be involved to prosecute this case. I know from my experience that class action cases can be very expensive to prosecute and take a long time to resolve. This case was formally filed in April 2011, but investigation of this matter commenced months prior to that date, during which time our office informally investigated the claims and began the process of drafting the initial Complaint. This means my firm has gone without any compensation for our work on this case for approximately 15 years. In short, this case has required me to forego significant other work, required the advancement of costs, and required a significant investment in time and resources, including the advancement of $127,546.76[18] in costs at a time when routine business expenses still had to be met.

(ECF No. 258-2, p. 11).

The Court concludes that counsel's decision to prosecute this case in lieu of other work and advancement of significant litigation costs based on a contingency fee agreement constitutes a risk to counsel that warrants an enhancement from the benchmark award of 25%.

Further, Plaintiffs' attorneys have litigated many class action cases and brought years of

---

[18] As discussed below, the correct amount of costs is $123,856.68.

experience to this case. (ECF No. 258-2, pp. 3-5, 11; ECF No. 258-3, pp. 28-29). Perhaps most notably, Attorney Sutton has "over 35 years of experience as a practicing attorney, most of which has focused on issues of employment and labor law." (ECF No. 258-2, p. 2). And as discussed above, this case has a long history, pending approximately 14 years, during which time Plaintiffs' counsel have, among other things, survived dispositive motion practice and litigated this case in state court, this Court, and on appeal to the Ninth Circuit. The Court finds that the performance of counsel warrants an upward departure.

In considering the range of fee awards in other common fund cases, the Court notes that other courts have awarded a 1/3 fee. *See Wonderly v. Youngblood*, No. 1:16-CV-01621-BAK-SKO, 2022 WL 378262, at *12 (E.D. Cal. Feb. 8, 2022) (awarding approximately 33.3% of the settlement fund in fees in employment class action); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 492 (E.D. Cal. 2010) (awarding approximately 33.3% of the settlement fund in fees for labor code violations and collecting cases awarding a similar amount).

Lastly, the Court crosschecks the percentage award with the lodestar method to determine if the fees sought from the common fund are reasonable. *In re Optical Disk Drive Prods. Antitrust Litig.*, 959 F.3d 922, 930 (9th Cir. 2020) ("[W]e have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable."). The lodestar is determined my multiplying a reasonable hourly rate by the reasonable number of hours spent on the case. *Fischer v. SJB-P.D. Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000) (explaining the loadstar method). When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *Barbosa v. Cargill Meat Sols. Corp.*, 297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted).

Plaintiffs' attorneys assert that they spent 3,887.95 hours of attorney work on this case, resulting in a total amount of attorneys' fees of $2,406,221.25 if based on a collective rate of approximately $618 per hour.[19] (*See* ECF No. 258-1, p. 26). Attorney Sutton's declaration includes a chart listing a host of attorneys and their numbers of hours and hourly rates spent on this case. (ECF No. 258-2, p. 7).

---

[19] This hourly rate is determined by dividing $2,406,221.25 by 3,887.95 hours.

First, the Court finds the 3,887.95 hours expended to be reasonable given that this case has been highly litigated for approximately 14 years. Moreover, even if the Court were to award a relatively low hourly rate for all the hours worked here—$250—the resulting lodestar amount based on 3,887.95 hours of work would far exceed the requested amount. *Sanchez v. Frito-Lay, Inc.*, No. 1:14-CV-00797 AWI, 2015 WL 4662636, at *18 (E.D. Cal. Aug. 5, 2015), *report and recommendation adopted*, 2015 WL 5138101 (E.D. Cal. Aug. 26, 2015) ("Recently, this Court has reviewed the billing rates for the Fresno Division and concluded that hourly rates generally accepted in the Fresno Division for competent experienced attorneys [are] between $250 and $380, with the highest rates generally reserved for those attorneys who are regarded as competent and reputable and who possess in excess of 20 years of experience.") (quotation marks and citation omitted). Specifically, $250 x 3,887.95 hours = $971,987.50 or roughly 3 times the $331,666.66 sought here.

Accordingly, even with a very conservative estimation of the lodestar amount, the crosscheck supports the 1/3 fee requested.

Lastly, turning to costs, "[t]here is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros*, 303 F.R.D. at 375 (citation omitted). And attorneys may recover "reasonable litigation expenses incurred for the benefit of the class." *Sanchez*, 2015 WL 4662636, at *20. Costs may also be awarded under California law to an individual who prevails on a PAGA claim. *See* Cal. Lab. Code § 2699(g).

Here, the declaration of Attorney Sutton states as follows:

> In addition to our request for fees, our firm further requests reimbursement of the reasonable out-of-pocket expenses advanced and/or incurred in connection with this litigation. Throughout the duration of this case, which has lasted more than 14 years, our firm has incurred actual expenses in the amount of $127,546.76. The costs are all litigation-related costs including but not limited to filing and motion fees, expert witness fees, travel expenses, mediation fees, court reporter and other deposition-related costs, copy charges, postage charged, and delivery fees. Accordingly, we request that the Court approve our request for reimbursement of costs in the amount of $127,546.76, which is less than the maximum amount Class Counsel is permitted to request pursuant to the terms of the Settlement.

(ECF No. 258-2, p. 11).

Following the hearing, the Court ordered Plaintiffs' counsel to file an itemization of these

costs, which counsel did. (ECF No. 260). As part of the supplemental filing, Plaintiffs included

the declaration of Attorney Briggs, which states as follows:

> However, upon reviewing [the itemization of costs at Exhibit 1] again for the
> purpose of preparing this Supplemental Declaration, I very quickly noticed that I
> had made a glaring error by using the wrong amount of total costs throughout the
> Motion papers. As shown on page 21 of Exhibit 1, the printout includes two
> different figures under the column showing total costs. The first number—
> $127,546.76—shows total debits to date. The second number—$123,856.68—
> shows total debits, minus $3,690.08 in credits, primarily from voided checks.

(ECF No. 260-1, p. 2).

Accordingly, the actual amount of costs sought is $123,856.68. The Court has reviewed

the itemization provided and concludes that these costs are reasonable and thus should be

awarded. (*See* ECF No. 260-1, pp. 5-25).

### 8.     Class representative service payment

The named Plaintiffs ask the Court to award a total of $100,000 (or $25,000 for each of

them) as a class representative service payment, also referred to as an incentive award. (ECF No.

258-1, p. 18). Mostly, they contend that they have actively participated in this case for

approximately 14 years, providing beneficial assistance that contributed to the parties' settlement:

> Among other things, Plaintiffs provided valuable information regarding wage and
> hour policies and practices and also kept themselves informed of the developments
> in this Action, informed our office of developments and information relevant to
> this Action, participated in decisions concerning this Action, made themselves
> available and communicated with our office during discovery and settlement
> negotiations, and consulted with our firm regarding potential witnesses. Plaintiffs
> also provided employment documents to our office for review and investigation,
> willingly participated in discovery by reviewing and providing feedback on
> documents produced by Defendants, and assisted counsel in the preparation of
> discovery requests. The information and documentation provided by Plaintiffs
> were instrumental in establishing the wage and hour violations alleged in this
> action, and the Settlement would have been impossible without their participation.

(ECF No. 258-1, pp. 17-18).

A court may award incentive payments to named plaintiffs in class action cases and

PAGA actions. *Rodriguez*, 563 F.3d at 958-59 (noting that the purpose of incentive awards is to

"compensate class representatives for work done on behalf of the class, to make up for financial

or reputational risk undertaking in bringing the action, and, sometimes, to recognize their

willingness to act as a private attorney general"). The Ninth Circuit has emphasized, however,

that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Sols., Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013) (internal quotation marks and citation omitted).

To justify notable disparities between a class representative award and what other class members receive, a Plaintiff must present "evidence demonstrating the quality of plaintiff's representative service," such as "substantial efforts taken as class representative to justify the discrepancy between [his] award and those of the unnamed plaintiffs." *Alberto v. GMRI, Inc.*, 252 F.R.D. 652, 669 (E.D. Cal. 2008).

To evaluate the reasonableness of a requested service payment, the Court may consider several factors, including the number of the named plaintiffs receiving such payments, the time and actions undertaken by the class representatives; the fairness of the hourly rate, and the proportion of the total settlement spent on such awards and comparison to the average award to the class members. *See, e.g., In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (considering the number of named plaintiffs that received an incentive payment, the amount of the incentive award, and the proportion of the total incentive award compared to the total settlement fund); *Ontiveros*, 303 F.R.D at 366 (considering the actions undertaken and evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received"); *Smith v. Am. Greetings Corp.*, 2016 WL 362395, at *10 (N.D. Cal. Jan. 29, 2016) (noting that "courts consider the proportionality between the incentive payment and the range of class members' settlement awards"). Lastly, Courts have found a service award of $5,000 to be presumptively reasonable. *See Weiner v. Ocwen Fin. Corp.*, 2024 WL 4458383, at *6 (E.D. Cal. Oct. 10, 2024); *see also Wong v. Arlo Techs. Inc.*, 2021 WL 1531171, at *12 (N.D. Cal. Apr. 19, 2021) (noting that "[s]ervice awards as high as $5,000 are presumptively reasonable" in the Ninth Circuit and collecting cases).

As explained below, the Court concludes that an incentive award for each of the named Plaintiff is warranted. However, because the requested $100,000 is excessive, the Court will reduce the award to $40,000 total (or $10,000 per named Plaintiff) with the unallocated $60,000

1  to go to the class members.

2          First, the Court finds it noteworthy that there are four named Plaintiffs in this case, and

3  each is requesting $25,000, for a total of $100,000. Plaintiffs do not address the reasoning behind

4  why all four were named Plaintiffs in this case, and as discussed further below, it appears that

5  they generally provided overlapping services. While the Ninth Circuit has concluded that an

6  award to multiple named plaintiffs is permissible, it has also indicated that it is appropriate to

7  consider the total incentive payment when multiple named plaintiffs are involved compared to the

8  settlement amount. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) ("In the proposed

9  consent decree in this case, 29 named class representatives are designated to receive payments

10  totaling $890,000. Compared to the three cases just mentioned, the different orders of magnitude

11  in the present case concerning the number of named plaintiffs receiving incentive payments, the

12  proportion of the payments relative to the settlement amount, and the size of each payment—here

  up to $50,000, with an average of more than $30,000—are obvious.").

13          The Court has reviewed each of the named Plaintiffs' declarations about the work they

14  performed, and note that they provided many similar services. For example, each of their

15  declarations contains identical language about some of their contributions, including Plaintiffs

16  discussing their "hour-by-hour daily activities," the "names of managers and names of co-workers

17  who could be potential witnesses," and their "earnings" and how they were paid. (ECF No. 258-4,

18  p. 3; ECF No. 258-5, p. 3; ECF No. 258-6, p. 3; ECF No. 258-7, p. 3).  Further, awarding

19  $100,000 would equal almost 10% of the total settlement amount of $995,000. While the Court

20  concludes that the named Plaintiffs are entitled to some incentive award, the very high amount

21  requested here would consume too much of the settlement to be considered reasonable. Rather, as

22  further explained below, the Court concludes that an award of $10,000 to each Plaintiff (or

23  $40,000 total) fairly compensates their efforts in this case without the risk of awarding time spent

24  on duplicative work.

25          Next, the Court considers the time and actions undertaken by the class representatives and

26  the fairness of their resulting hourly rate. While none of the Plaintiffs kept precise records of the

27  time they spent working on this case, they represent that they spent a significant amount of time

28  assisting counsel. Specifically, Plaintiffs Cruz, Baiz, and Madrigal estimate spending 175-210

hours each on the case. (ECF No. 258-4, p. 5; ECF No. 258-5, p. 5; ECF No. 258-7, p. 5). And Plaintiff Goodman estimates spending 160-195 hours on the case (ECF No. 258-6, p. 5). Some of the tasks that Plaintiffs participated in include advising counsel about their employment, preparing filings, providing documents, responding to discovery, and participating in settlement negotiations. The Court concludes that the significant amount of time and effort that Plaintiffs spent on this case warrants an incentive award, but not $100,000.

As discussed above, Plaintiffs provided many identical services, and the Court is reluctant to award duplicate effort in prosecuting this case. Second, assuming an approximate average of 200 hours spent on this case by each Plaintiff would net them an hourly rate of $125 per hour.[20] Plaintiffs each filed a supplemental declaration regarding their earnings around the time this case was pending, and while the amounts varied, they were mostly in the minimum-wage range. (ECF No. 260-2, p. 2 ($14 per hour); ECF No. 260-3, p. 2 (earnings of $15,000 to $17,000 per year); ECF No. 260-4, p. 2 ($9 per hour for daycare, waitressing, and bartending jobs, now self-employed in aesthetician business and charging $60 for a 30-minute session and $100 for a 60-minute session); ECF No. 260-5, p.2 ($14 to $18 per hour for various jobs)). Accordingly, for the vast majority of the amounts that Plaintiffs have earned, the $125 hourly rate is much higher than their typical hourly earnings. The Court finds the following case instructive on this issue:

> An incentive award of $20,000 compensates Mr. Ontiveros at a rate of $73.80 per hour. Incentive awards should be sufficient to compensate class representatives to make up for financial risk,—for example, for time they could have spent at their jobs. Overcompensating named plaintiffs at the expense of a reduction in the common fund available to class remembers could encourage collusion at the settlement stage of class actions where a named plaintiff's interest naturally diverges from that of the class, compromising his role as a judge of adequacy. The court finds that a downward departure from the award proposed by parties from $73.80 per hour to $50 per hour fairly compensates the named plaintiff for his time and incorporates an extra incentive to participate in litigation.

*Ontiveros*, 303 F.R.D. at 366 (footnote and citation omitted).

Likewise, the Court concludes that an award of $50 per hour based on an approximate 200 hours of work, or $10,000, fairly compensates them for their time, with an added incentive for their participation in the case, without overcompensating them at the risk of depriving the other class members of their fair share of the settlement.

---

[20] This amount is calculated by dividing $25,000 (the amount each Plaintiff requests) by 200 hours.

Lastly, the Court considers the proportion of the total settlement spent on such awards and comparison to the average award to the class member. As noted above, if Plaintiffs were granted $100,000, that would consume nearly 10% of the entire settlement fund. Further, the $25,000 per each named Plaintiff is almost 21 times the amount that the average class member is expected to receive ($1,190.08). Thus, the Court concludes that the amount sought is excessive.

As discussed in connection with the other considerations, the Court concludes that awarding $40,000 (or $10,000 per Plaintiff) appropriately compensates Plaintiffs for their time and acts as an incentive for their service in this case. This amount represents a substantially lower percentage of the overall settlement (*i.e.*, about 4%), but each Plaintiff will still receive about 8 times more than the average class member, thus awarding Plaintiffs for their service while avoiding overcompensating them to the detriment of the other class members.

### 9.    Costs of a settlement administrator

The Court previously conditionally approved ILYM Group, Inc. as the settlement administrator with a $7,950 cap in costs. (ECF No. 257, p. 33). Plaintiffs have provided the declaration of Nathalie Hernandez, a case manager for ILYM Group, Inc. who notes that the settlement administrator has performed its duties and will continue to perform certain tasks:

> ILYM Group was engaged by the Parties' Counsel and subsequently approved and appointed by the Court to provide notification services and settlement administration, pursuant to the terms of the Settlement, in the above referenced Action. Duties performed to-date and to be performed after Final Approval of the Settlement is granted, include: (a) printing and mailing the Notice of Class Action and Representative Action Settlement, and Opt-Out or Request for Exclusion Form, in both English and Spanish (referred to as "Notice Packet"); (b) receiving and processing requests for exclusion; (c) resolving Settlement Class Members' disputes over the number of workweeks Defendants have record of them working during the Class Period, which was pre-printed on their individualized Notice Packet; (d) calculating individual settlement award amounts; (e) processing and mailing settlement award checks; (f) handling tax withholdings as required by the Settlement and the law; (g) preparing, issuing and filing tax returns and other applicable tax forms; (h) handling the distribution of any unclaimed funds pursuant to the terms of the Settlement; and (i) performing other tasks as the Parties mutually agree to and/or the Court orders ILYM Group to perform.

(ECF No. 258-8, p. 2). Further, the declaration states that "ILYM Group's total fees and costs for services in connection with the administration of this Settlement, which includes fees and costs incurred to-date, as well as anticipated fees and costs for completion of the settlement

administration, are $7,950.00." (*Id.* at 5).

Given that the settlement administrator has undertaken and will complete its duties to administer the settlement, and for the amount previously requested, the Court will approve payment of $7,950 to ILYM Group, Inc.

**V.    CONCLUSION AND ORDER**

Based on the forgoing, IT IS ORDERED as follows:

1. Plaintiffs' motion for class certification and final approval is granted, in part, as specified below. (ECF No. 258).

2. The following settlement class is certified: All non-exempt employees of MM 879, Inc., who performed work in California from April 6, 2007, through January 18, 2019.

3. The Court approves Plaintiffs Angela Cruz, Maria Madrigal, Lourdes Baiz, and Christie Goodman as the class representatives.

4. The Court approves S. Brett Sutton and Brady Briggs of Sutton Hague Law Corporation, P.C. as class counsel.

5. The Court approves a $995,000 gross settlement amount.

6. The Court approves an award of $331,666.66 in attorneys' fees.

7. The Court approves an award of $123,856.68 in costs.

8. The Court approves ILYM Group, Inc. as the settlement administrator and permits payment of $7,950 to it as costs.

9. The Court approves a $75,000 PAGA payment, with $56,250 of this amount being paid to the LWDA and the $18,750 remainder going to the aggrieved employees.

10. The Court approves a class representative service payment of $40,000 total, with $10,000 going to each of the four named Plaintiffs—Angela Cruz, Maria Madrigal, Lourdes Baiz, and Christie Goodman. As Plaintiffs requested a $100,000 service payment, the unallocated $60,000 shall be used to fund payments to the class members and shall be allocated using the formula contained in the parties' settlement agreement.

11. Upon completion of administration of the settlement, the Settlement Administrator will provide written certification of such completion to the Court and counsel for the parties.

12. The parties will bear their own costs and attorneys' fees except as otherwise provided by

the settlement and this order.

13. Without affecting the finality of this order in any way, the Court retains jurisdiction of all matters relating to the interpretation, administration, implementation, effectuation and enforcement of this order and the settlement.

14. The Clerk of Court is directed to issue a final judgment consistent with this order and then to close this case.

IT IS SO ORDERED.

Dated: __**October 27, 2025**__           /s/ _Erica P. Grosjean_
                                          UNITED STATES MAGISTRATE JUDGE